# AMERICAN PARTY OF TEXAS ET AL. *v.* WHITE, SECRETARY OF STATE OF TEXAS

No. 72–887.  Argued November 5, 1973—Decided March 26, 1974*

---

*Together with No. 72–942, *Hainsworth* v. *White, Secretary of State of Texas,* also on appeal from the same court.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed an opinion dissenting in part, *post*, p. 795.

*Gloria Tanner Svanas* argued the cause for appellants in No. 72–887 and filed a brief for appellant American Party of Texas. *Michael Anthony Maness* filed a brief for appellants Texas New Party et al. in No. 72–887. *Robert W. Hainsworth,* appellant *pro se,* argued the cause and filed briefs in No. 72–942.

*John L. Hill,* Attorney General of Texas, argued the cause for appellee in both cases. With him on the brief were *Larry F. York,* First Assistant Attorney General, and *J. C. Davis* and *Sam L. Jones, Jr.,* Assistant Attorneys General.

MR. JUSTICE WHITE delivered the opinion of the Court.

These cases began when appellants, minority political parties and their candidates, qualified voters supporting the minority party candidates, and independent unaffiliated candidates, brought four separate actions in the United States District Court for the Western District of Texas against the Texas Secretary of State seeking declaratory and injunctive relief against the enforcement of various sections of the Texas Election Code.

The American Party of Texas sought ballot position at the general election in 1972 for a slate of candidates for various statewide and local officers, including governor and county commissioner.[1] The New Party of Texas wanted ballot recognition for its candidates for the general election for governor, Congress, state representative and county sheriff. The Socialist Workers Party made similar claims with respect to its candidates for governor, lieutenant governor and United States Senator.[2] Laurel Dunn, a nonpartisan candidate, at-

---

[1] Although the November 1972 election has been completed and this Court may not grant retrospective relief that would affect the outcome, this case is not moot. See *Rosario* v. *Rockefeller,* 410 U. S. 752, 756 n. 5 (1973); see also *Storer* v. *Brown, ante,* at 737 n. 8.

[2] The District Court dismissed the complaints of the Texas Socialist Workers Party and another minority party, La Raza Unida, insofar as they challenged Art. 13.45 (2) (Supp. 1973) of the Election Code, because they lacked standing in view of their later certification by appellee for a place on the general ballot. *Raza Unida Party* v. *Bullock,* 349 F. Supp. 1272, 1276 (WD Tex. 1972). La Raza Unida has not appealed and the Socialist Workers Party, although an

tempted to run for the United States House of Representatives from the Eleventh Congressional District. In his action, he represented himself and other named independent candidates for state and local offices. Finally, Robert Hainsworth sought election as state representative from District No. 86.

In these actions, it was alleged that, by excluding appellants from the general election ballot, various provisions of the Texas Election Code infringed their First and Fourteenth Amendment right to associate for the advancement of political beliefs and invidiously discriminated against new and minority political parties, as well as independent candidates. Appellants sought to enjoin the enforcement of the challenged provisions in the forthcoming November 1972 general election. They also challenged the failure of the Texas law to require printing minority party and independent candidates on absentee ballots and the exclusion of minority parties from the benefits of the McKool-Stroud Primary Law of 1972. The individual cases involving the parties in No. 72–887 were consolidated, and a statutory three-judge District Court was convened. Following a trial, the District Court denied all relief after holding that, in their totality, the challenged provisions served a compelling state interest and did not suffocate the election process. *Raza Unida Party* v. *Bullock*, 349 F. Supp. 1272 (WD Tex. 1972). Hainsworth, appellant in No. 72–942, was

appellant here, does not appear to challenge the District Court's judgment that it had no standing to challenge Art. 13.45 (2). The District Court's dismissal, however, did not go beyond the attack on Art. 13.45 (2). It does not appear that ballot qualification would affect the standing of the Socialist Workers Party to challenge the Texas Primary Financing Law or the denial of absentee voting privileges to it. Both issues were presented in the Jurisdictional Statement filed by the party and appear as minor themes in the party's brief on the merits.

also subsequently denied relief on similar grounds. Two separate appeals were taken, and we noted probable jurisdiction. 410 U. S. 965. We affirm the judgment of the District Court in No. 72–942, and in No. 72–887, except as the latter relates to the Socialist Workers Party and Texas' absentee ballot provisions.

## I

The State of Texas has established a detailed statutory scheme for regulating the conduct of political parties as it relates to qualifying for participation in the electoral process. Under the laws challenged in this case, four methods are provided for nominating candidates to the ballot for the general election.[3]

Candidates of political parties whose gubernatorial candidate polled more than 200,000 votes in the last general election may be nominated by primary election only, and the nominees of these parties automatically appear on the ballot. Tex. Election Code, Art. 13.02 (1967).[4] Texas holds a statewide primary for these

---

[3] Texas also allows write-in votes in most elections, and they are counted. Tex. Election Code, Arts. 6.05, 6.06 (Supp. 1974).

[4] "On primary election day in 1952 and every two (2) years thereafter, candidates for Governor and for all other State offices to be chosen by vote of the entire State, and candidates for Congress and all district offices to be chosen by the vote of any district comprising more than one (1) county, to be nominated by each organized political party that cast two hundred thousand (200,000) votes or more for governor at the last general election, shall, together with all candidates for offices to be filled by the voters of a county, or of a portion of a county, be nominated in primary elections by the qualified voters of such party." Tex. Election Code, Art. 13.02 (1967).

We describe the law as it existed in 1972. While these cases were pending in this Court, the Texas Legislature amended Art. 13.02 of the Election Code to the extent that the mandatory primary election requirement, and the resulting automatic general election ballot position, are now triggered only when an organized political party casts

major parties on the first Saturday in May, with a runoff primary the first Saturday in June, should no candidate garner a majority. Art. 13.03 (1967).

Candidates of parties whose candidate polled less than 200,000 votes, but more than 2% of the total vote cast for governor in the last general election may be nominated and thereby qualify for the general election ballot by primary election or nominating conventions. Art. 13.45 (1) (Supp. 1973).[5] The nominating conventions

20% or more of the votes cast for governor at the last general election and not the previous 200,000 votes. At oral argument, counsel for appellants maintained that the Texas Legislature raised the automatic ballot qualification figure to 20% after the La Raza Unida Party gubernatorial candidate polled more than 2% of the total vote in the 1972 general election. Counsel further intimated that the law will be changed again should a minority party fulfill the new requirements. Tr. of Oral Arg. 7–8. Whatever their merits, we do not reach these contentions. The issues in this case revolve principally around the signature requirements for minority parties and independent candidates and are unaffected by the above amendment or by the amendment referred to in n. 5, *infra*.

[5] "Any political party whose nominee for Governor in the last preceding general election received as many as two percent of the total votes cast for Governor and less than two hundred thousand votes, may nominate candidates for the general election by primary elections held in accordance with the rules provided in this code for the primary elections of parties whose candidate for Governor received two hundred thousand or more votes at the last general election; or such party may nominate candidates for the general election by conventions as provided in [Arts. 13.47 and 13.48]." Tex. Election Code, Art. 13.45 (1) (Supp. 1973).

During the pendency of these cases in this Court, the Texas Legislature, in the same Act amending Art. 13.02, amended Art. 13.45 (1). Starting in 1976, a political party whose nominee for governor in the last preceding general election received as many as 2% but less than 20% of the total votes cast for governor *must* nominate its candidates for the general election by *conventions*. For the 1974 elections, however, the amendment to Art. 13.45 (1) provides that those political parties receiving between 2%

are held sequentially, with the precinct conventions on the same date as the statewide primaries for the major parties (the first Saturday in May), the county conventions on the following Saturday, and the state convention on the second Saturday in June. Art. 13.47 (Supp. 1974); Art. 13.48 (1967).

Because their candidates polled less than 2% of the total gubernatorial vote in the preceding general election or they did not nominate a candidate for governor, the political parties in this litigation were required to pursue the third method for ballot qualification: precinct nominating conventions and if the required support was not evidenced at the conventions, the circulation of petitions for signatures. Art. 13.45 (2) (Supp. 1973).[6]

and 20% of the 1972 gubernatorial vote will continue to have a choice between primary elections and conventions.

[6] "Any political party whose nominee for governor received less than two percent of the total votes cast for governor in the last preceding general election, or any new party, or any previously existing party which did not have a nominee for governor in the last preceding general election, may also nominate candidates by conventions as provided in [Arts. 13.47 and 13.48], but in order to have the names of its nominees printed on the general election ballot there must be filed with the secretary of state, within 20 days after the date for holding the party's state convention, the list of participants in precinct conventions held by the party in accordance with [Arts. 13.45a and 13.47] of this code, signed and certified by the temporary chairman of each respective precinct convention, listing the names, addresses (including street address or post-office address), and registration certificate numbers of qualified voters attending such precinct conventions in an aggregate number of at least one percent of the total votes cast for governor at the last preceding general election; or if the number of qualified voters attending the precinct conventions is less than that number, there must be filed along with the precinct lists a petition requesting that the names of the party's nominees be printed on the general election ballot, signed by a sufficient number of additional qualified voters to make a combined total of at least one percent of the total votes cast for governor at the last general election. The address and registration certificate

Finally, unaffiliated nonpartisan or independent candidates such as Dunn and Hainsworth could qualify by filing within a fixed period a written application or petition signed by a specified percentage of the vote cast for governor in the relevant electoral district in the last general election. Arts. 13.50, 13.51 (1967).[7]

number of each signer shall be shown on the petition. No person who, during that voting year, has voted at any primary election or participated in any convention of any other party shall be eligible to sign the petition. To each person who signs the petition there shall be administered the following oath, which shall be reduced to writing and attached to the petition: 'I know the contents of the foregoing petition, requesting that the names of the nominees of the ——————— Party be printed on the ballot for the next general election. I am a qualified voter at the next general election under the constitution and laws in force, and during the current voting year I have not voted in any primary election or participated in any convention held by any other political party.' The petition may be in multiple parts. One certificate of the officer administering the oath may be so made as to apply to all to whom it was administered. The petition may not be circulated for signatures until after the date set by [Art. 13.03] of this code for the general primary election. Any signatures obtained on or before that date are void. Any person who signs a petition after having voted in a primary election or participated in a convention of any other party during the same voting year is guilty of a misdemeanor and upon conviction shall be fined not less than $100 nor more than $500.

"The chairman of the state executive committee shall be responsible for forwarding the precinct lists and petition to the secretary of state.

"At the time the secretary of state makes his certifications to the county clerks as provided in [Art. 1.03] of this code, he shall also certify to the county clerks the names of parties subject to this subdivision which have complied with its requirements, and the county clerks shall not place on the ballot the names of any nominees of such a party which have been certified directly to them unless the secretary of state certifies that the party has complied with these requirements." Tex. Election Code, Art. 13.45 (2) (Supp. 1973).

[7] "The name of a nonpartisan or independent candidate may be printed on the official ballot in the column for independent can-

## II

We consider first the appeals of the political parties and their supporters. Article 13.45 (2) (Supp. 1973) of the Texas Election Code, the validity of which is at issue

didates, after a written application signed by qualified voters addressed to the proper officer, as herein provided, and delivered to him within thirty days after the second primary election day, as follows:

"If for an office to be voted for throughout the state, the application shall be signed by one per cent of the entire vote of the state cast for Governor at the last preceding general election, and shall be addressed to the Secretary of State.

"If for a district office in a district composed of more than one county, the application shall be signed by three per cent of the entire vote cast for Governor in such district at the last preceding general election, and shall be addressed to the Secretary of State.

"If for a district office in a district composed of only one county or part of one county, the application shall be signed by five per cent of the entire vote cast for Governor in such district at the last preceding general election, and shall be addressed to the Secretary of State.

"If for a county office, the application shall be signed by five per cent of the entire vote cast for Governor in such county at the last preceding general election, and shall be addressed to the county judge.

"If for a precinct office, the application shall be signed by five per cent of the entire vote cast for Governor in such precinct at the last preceding general election, and shall be addressed to the county judge.

"Notwithstanding the foregoing provisions, the number of signatures required on an application for any district, county, or precinct office need not exceed five hundred.

"No application shall contain the name of more than one candidate. No person shall sign the application of more than one candidate for the same office; and if any person signs the application of more than one candidate for the same office, the signature shall be void as to all such applications. No person shall sign such application unless he is a qualified voter, and no person who has voted at either the general primary election or the runoff primary election of any party shall sign an application in favor of anyone for

here, requires that the political parties to which it applies nominate candidates through the process of precinct, county, and state conventions. The party must also evidence support by persons numbering at least 1% of the total vote cast for governor at the last preceding general election. In 1972, this number was approximately 22,000 electors. Two opportunities are offered to satisfy the 1% signature requirement. At the statutorily mandated

---

an office for which a nomination was made at either such primary election.

"The application shall contain the following information with respect to each person signing it: his address and the number of his poll tax receipt or exemption certificate and the county of issuance; or if he is exempt from payment of a poll tax and not required to obtain an exemption certificate, the application shall so state.

"Any person signing the application of an independent candidate may withdraw and annul his signature by delivering to the candidate and to the officer with whom the application is filed (or is to be filed, if not then filed), his written request, signed and duly acknowledged by him, that his signature be cancelled and annulled. The request must be delivered before the application is acted on, and not later than the day preceding the last day for filing the application. Upon such withdrawal, the person shall be free to sign the application of another candidate for the same office." Tex. Election Code, Art. 13.50 (1967).

"To every citizen who signs such application, there shall be administered the following oath, which shall be reduced to writing and attached to such application: 'I know the contents of the foregoing application; I have not participated in the general primary election or the runoff primary election of any party which has nominated, at either such election, a candidate for the office for which I desire ————— (here insert the name of the candidate) to be a candidate; I am a qualified voter at the next general election under the Constitution and laws in force and have signed the above application of my own free will.' One certificate of the officer before whom the oath is taken may be so made as to apply to all to whom it was administered." Art. 13.51 (1967).

precinct nominating conventions, held on the first Satur-
day in May and the same day as the major party primary,
the party must prepare a list of all participants, who must
be qualified voters, along with other pertinent informa-
tion. The list is to be forwarded to the Secretary of State
within 20 days after the convention. If it reveals the
necessary support and if the party has satisfied the other
statutory requirements imposed upon all political parties,
the Secretary of State will certify that the party is
entitled to be placed on the general election ballot.

Should the party not obtain the requisite 1% con-
vention participation, supplemental petitions may be
circulated for signature. When these are signed by a
sufficient number of qualified voters in addition to the
convention lists to make a combined total of the requisite
1%, the party qualifies for the ballot. Approximately
55 days after the general primary election in May are
allotted for the supplementation process. A voter who
has already participated in any other party's primary
election or nominating process is ineligible to sign the
petition. Furthermore, each signatory must be adminis-
tered and sign an oath that he is a qualified voter and
has not participated in any other party's nominating or
qualification proceedings. The oath must also be
notarized.

The American Party of Texas was able to secure only
2,732 signatures at its precinct conventions in May 1972.
By the deadline for filing the precinct lists and supple-
mental petitions, the total had risen to 7,828, far short
of the over 22,000 required signatures. Brief for Ameri-
can Party of Texas 2–3.[8] The Texas New Party ap-

---

[8] Prior to the convening of the three-judge court, the single-
judge District Court had temporarily restrained appellee from
refusing to accept and file supplemental nominating petitions ob-
tained by the American Party of Texas between the statutory

parently made no effort to comply with the 1% require-
ment.[9] Two relatively small parties, however, which
were also plaintiffs in this litigation, La Raza Unida
Party and the Socialist Workers Party, complied with
the qualification provisions of Art. 13.45 (2) (Supp. 1973)
and were placed on the general election ballot.

The party appellants challenge various aspects of the
Texas ballot qualification system as they interact with
each other: the 1% support requirement with its precinct
conventions and petition apparatus, the preprimary ban
on petition circulation, the disqualification from signing
of those voters participating in another party's nominat-
ing process, the 55-day limitation on securing signatures,
and the notarization requirement.[10] They assert that

deadline for filing them, June 30, 1972, and September 1, 1972.
During the additional court-ordered circulation period, the Ameri-
can Party of Texas garnered 17,678 additional signatures, bringing
their total to over 25,000. Brief for American Party of Texas 5.
In its final order, the three-judge District Court dissolved the
restraining order and declared all signatures gathered during the ex-
tended period to be null and void. 349 F. Supp., at 1286. This Court
denied a subsequent application for a temporary restraining order,
409 U. S. 803 (1972).

[9] Tr. of Oral Arg. 24.

[10] Appellants also challenged two aspects of the Texas Election
Code unrelated to ballot qualification: exclusion from public financing
for nomination and ballot qualification expenses and restrictions on
the availability of absentee ballots. These provisions are discussed
separately in Parts IV and V, *infra*.

The American Party and Texas New Party challenged in the Dis-
trict Court on equal protection and due process grounds the require-
ment of Art. 13.47a (1) (1967) that a person seeking nomination as
a minority party candidate comply with Art. 13.12 and file a decla-
ration to this effect approximately three months before the party
primaries and conventions. The District Court upheld this provi-
sion, noting that it applied to *all* political parties. In this Court,
only the Texas New Party has discussed this restriction. While this
appellant seems to be arguing that this requirement, along with all
others imposed upon minority political parties, makes its ballot

these preconditions for access to the general election ballot are impermissible burdens on rights secured by the First and Fourteenth Amendments and violate the Equal Protection Clause of the Fourteenth Amendment as invidious discriminations against new or small political parties.

We have concluded that these claims are without merit. We agree with the District Court that whether the qualifications for ballot position are viewed as substantial burdens on the right to associate or as discriminations against parties not polling 2% of the last election vote, their validity depends upon whether they are necessary to further compelling state interests, *Storer* v. *Brown, ante,* at 729–733.[11] But we also agree with the District

---

qualification more burdensome, we are unable to distinguish this contention from the party's overall attack on the Texas statutory scheme. As such, it must fail for the reasons discussed in Part II of the opinion. Moreover, appellant readily concedes that "[t]his requirement is identical to that imposed upon prospective candidates for a major party nomination by Art. 13.12." Brief for Texas New Party 7. We do not understand appellant to be arguing that the State may impose no deadline for declaring one's candidacy. Nor do we read its brief on the merits as challenging the reasonableness of the three-month benchmark chosen by Texas. Under these circumstances, we affirm the judgment of the District Court on this point.

[11] "The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot. In determining whether the State has power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that 'only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.' *NAACP* v. *Button,* 371 U. S. 415, 438 (1963)." *Williams* v. *Rhodes,* 393 U. S. 23, 31 (1968). See also *Kusper* v. *Pontikes,* 414 U. S. 51, 56–59 (1973).

Court that the foregoing limitations, whether considered alone or in combination, are constitutionally valid measures, reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways.

It is too plain for argument, and it is not contested here, that the State may limit each political party to one candidate for each office on the ballot and may insist that intraparty competition be settled before the general election by primary election or by party convention. See *Storer* v. *Brown, ante,* at 733–736. Neither can we take seriously the suggestion made here that the State has invidiously discriminated against the smaller parties by insisting that their nominations be by convention, rather than by primary election. We have considered the arguments presented, but we are wholly unpersuaded by the record before us that the convention process is invidiously more burdensome than the primary election, followed by a runoff election where necessary, particularly where the major party, in addition to the elections, must also hold its precinct, county, and state conventions to adopt and promulgate party platforms and to conduct other business.[12] If claiming an equal protection violation, the appellants' burden was to demonstrate in the first instance a discrimination against them of some substance. "Statutes create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution." *Ferguson* v. *Skrupa,* 372 U. S. 726, 732 (1963) (footnote omitted). Appellants' burden is not satisfied by mere assertions that small parties must proceed by convention when major parties are permitted to choose their candidates by primary election. The procedures are different, but

---

[12] See, *e. g.,* Tex. Election Code, Arts. 13.33, 13.34, 13.35, 13.37, 13.38 (1967, Supp. 1973, Supp. 1974).

the Equal Protection Clause does not necessarily forbid the one in preference to the other.[13]

To obtain ballot position, the parties subject to Art. 13.45 (2) (Supp. 1973), as were these appellants, were also required to demonstrate support from electors equal in number to 1% of the vote for governor at the last general election. Appellants apparently question whether they must file any list of supporters where the major parties are required to file none. But we think that the State's admittedly vital interests [14] are sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measurable quantum of commnuity support. So long as the larger parties must demonstrate major support among the electorate at

[13] "The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. [A State is not] guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot. Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in *Williams* v. *Rhodes, supra.*" *Jenness* v. *Fortson,* 403 U. S. 431, 441–442 (1971).

[14] Appellants concede, as we think they must, that the objectives ostensibly sought by the State, *viz.,* preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion, are compelling. Brief for Texas New Party 18–19. See, *e. g., Rosario* v. *Rockefeller,* 410 U. S., at 761; *Dunn* v. *Blumstein,* 405 U. S. 330, 345 (1972); *Bullock* v. *Carter,* 405 U. S. 134, 145 (1972); *Williams* v. *Rhodes,* 393 U. S., at 32. As we said only recently in *Jenness* v. *Fortson, supra,* at 442:

"There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."

the last election, whereas the smaller parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner. Of course, what is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot. The Constitution requires that access to the electorate be real, not "merely theoretical." *Jenness* v. *Fortson,* 403 U. S. 431, 439 (1971).

The District Court recognized that any fixed percentage requirement is necessarily arbitrary, but we agree with it that the required measure of support—1% of the vote for governor at the last general election and in this instance 22,000 signatures—falls within the outer boundaries of support the State may require before according political parties ballot position.[15] To demonstrate this degree of support does not appear either impossible or impractical, and we are unwilling to assume that the requirement imposes a substantially greater hardship on minority party access to the ballot.[16] Two political par-

[15] The District Court balanced this lenient 1% petition requirement against what it thought was a somewhat burdensome requirement of precinct, county, and state conventions and concluded that, as a whole, the system was valid. Actually, save the precinct nominating conventions, the party nominating convention process is unrelated to ballot qualification and corresponds more to the democratic management of the political party's internal affairs.

[16] As we have already indicated, the nominees of the two major parties are automatically placed on the general election ballot, but this is only because these parties have recently demonstrated substantial voter appeal. Texas has chosen this reasonable way to measure public support for the more established political parties. We do not understand appellants to argue that the Democratic and Republican Parties in Texas must also be required to circulate petitions and garner the requisite 1% showing. We further doubt that appellants would care to be forced to conduct a primary

ties which were plaintiffs in this very litigation qualified for the ballot under Art. 13.45 (2) (Supp. 1973) in the 1972 election. It is not, therefore, immediately obvious that the Article, on its face or as it operates in practice, imposes insurmountable obstacles to fledgling political party efforts to generate support among the electorate and to evidence that support within the time allowed.

The aspiring party is free to campaign before the primary and to compete with the major parties for voter support on primary election and precinct convention day. Any voter, however registered, may attend the new party's precinct convention and be counted toward the necessary 1% level. Unlike the independent candidate under Texas law, see *infra,* at 788, and his California counterpart, see *Storer* v. *Brown, ante,* at 738, a party qualifying under Art. 13.45 (2) (Supp. 1973) need not wait until the primary to crystallize its support among the voters. It is entitled to compete before the primary election *and* to count noses at its convention on primary day, just as the major parties and their candidates count their primary votes. Furthermore, should they fall short of the magic figure, they have another chance—they may make up the shortage and win ballot position by circulating petitions for signature for a period of 55 days beginning after the primary and ending 120 days prior to the general election.

---

election in every precinct in each of Texas' 254 counties. Cf. *Jenness* v. *Fortson, supra,* at 441. Moreover, the major parties, like their smaller or newer counterparts, must satisfy the same statutory qualifications as to declaration of candidacy, certifications of nominating process results, and the like. Texas has provided alternative routes to the ballot—statewide primaries and precinct conventions—and it is problematical at best which is more onerous in fact. It is sufficient to note that the system does not create or promote a substantial imbalance in the relative difficulty of each group to qualify for the ballot.

It is true that at this juncture the pool of possible supporters is severely reduced, for anyone voting in the just-completed primary is no longer qualified to sign the petition requesting that the petitioning party and its nominees for public office be listed on the ballot. Appellants attack this restriction, but, as such, it is nothing more than a prohibition against any elector's casting more than one vote in the process of nominating candidates for a particular office. Electors may vote in only one party primary; and it is not apparent to us why the new or smaller party seeking voter support should be entitled to get signatures of those who have already voted in another nominating primary and have already demonstrated their preference for other candidates for the same office the petitioning party seeks to fill. We think the three-judge District Court in *Jackson* v. *Ogilvie,* 325 F. Supp. 864, 867 (ND Ill.), aff'd, 403 U. S. 925 (1971), aptly characterized the situation in upholding a state election law provision preventing a voter from both voting in the primary and signing an independent election petition:

> "Thus, the state's scheme attempts to ensure that each qualified elector may in fact exercise the political franchise. He may exercise it either by vote or by signing a nominating petition. He cannot have it both ways." [17]

---

[17] The parties have not brought to our attention any decision holding that as a constitutional matter, a State is obligated to allow a voter to vote in a party primary and sign a nominating petition. It is true that under the Georgia system in *Jenness* v. *Fortson, supra,* the State had apparently decided that its legitimate goals would not be compromised by allowing voters to sign a petition even though they have signed others and participated in a party primary. Nothing in that decision, however, can be read to impose upon the States the affirmative duty to allow voters to move freely from one to the other method of nominating candidates for the

We have previously held that to protect the integrity of party primary elections, States may establish waiting periods before voters themselves may be permitted to change their registration and participate in another party's primary. *Rosario* v. *Rockefeller,* 410 U. S. 752 (1973). Cf. *Kusper* v. *Pontikes,* 414 U. S. 51 (1973). Likewise, it seems to us that the State may determine that it is essential to the integrity of the nominating process to confine voters to supporting one party and its candidates in the course of the same nominating process. At least where, as here, the political parties had access to the entire electorate and an opportunity to commit voters on primary day, we see nothing invidious in disqualifying those who have voted at a party primary from signing petitions for another party seeking ballot position for its candidates for the same offices.

Neither do we consider that the 55 days is an unduly short time for circulating supplemental petitions. Given that time span, signatures would have to be obtained only at the rate of 400 per day to secure the entire 22,000, or four signatures per day for each 100 canvassers— only two each per day if half the 22,000 were obtained at the precinct conventions on primary day. A petition procedure may not always be a completely precise or satisfactory barometer of actual community support for a political party, but the Constitution has never required

---

same public office. This reading becomes all the more evident in light of the fact that *Jackson* v. *Ogilvie,* 325 F. Supp. 864 (ND Ill. 1971), was affirmed on the same day that *Jenness* was decided, 403 U. S. 925. Indeed, the federal court decisions with which we are familiar agree with *Jackson* v. *Ogilvie* and reflect the views we adopt here. See, *e. g., Moore* v. *Board of Elections for the District of Columbia,* 319 F. Supp. 437 (DC 1970); *Wood* v. *Putterman,* 316 F. Supp. 646 (Md.), aff'd, 400 U. S. 859 (1970); *Socialist Workers Party* v. *Rockefeller,* 314 F. Supp. 984 (SDNY), aff'd, 400 U. S. 806 (1970).

the States to do the impossible. *Dunn* v. *Blumstein*, 405 U. S. 330, 360 (1972). Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization. Constitutional adjudication and common sense are not at war with each other, and we are thus unimpressed with arguments that burdens like those imposed by Texas are too onerous, especially where two of the original party plaintiffs themselves satisfied these requirements.[18]

Finally, there remains another facet to the signature requirement. Article 13.45 (2) (Supp. 1973) provides that all signatures evidencing support for the party, whether originating at the precinct conventions or with supplemental petitions circulated after primary day, must be notarized. The parties object to this requirement, but make little or no effort to demonstrate its impracticability or that it is unusually burdensome. The District Court determined that it was not, indicating that one of the plaintiff political parties had conceded as much. The District Court also found no alternative if the State was to be able to enforce its laws to prevent voters from crossing over or from voting twice for the same office. On the record before us, we are in no position to disagree.

In sum, Texas "in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life." *Jenness* v. *Fortson*, 403 U. S., at 439. It

---

[18] The 55-day period for petition circulation terminates 120 days before the general election. We agree with the District Court that some cutoff period is necessary for the Secretary of State to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges. We also believe that in view of the overall statutory scheme and particularly in light of the "second chance" Texas affords smaller political parties to qualify by petition, the 120-day pre-election filing deadline is neither unreasonable nor unduly burdensome.

affords minority political parties a real and essentially equal opportunity for ballot qualification. Neither the First and Fourteenth Amendments nor the Equal Protection Clause of the Fourteenth Amendment requires any more.

### III

Appellants Dunn and Hainsworth challenged Arts. 13.50 and 13.51, which govern the eligibility of nonpartisan or independent candidates for general election ballot position. Regardless of the office sought, an independent candidate must file, within 30 days after the second or runoff primary election, a written petition signed by a specified number of qualified voters. The signatures required vary with the office sought. Dunn was required to obtain signatures equaling 3% of the 1970 vote for governor in the congressional district in which he desired to run; Hainsworth, a candidate for the State House of Representatives, needed 5% of the same vote in his locality. Article 13.50, however, states that in no event would candidates for any "district office," as Dunn and Hainsworth were,[19] be required to file more that 500 signatures. The law also provides that a voter may not sign more than one petition for the same office and is barred from signing any petitions if he voted at either primary election of any party at which a nomination was made for that office. Each voter signing an independent candidate's petition must also subscribe to a notarized oath declaring his nonparticipation in any political party's nominating process. Art. 13.51.

Dunn and Hainsworth contend that the First and Fourteenth Amendments, including the Equal Protection Clause, forbid the State to impose unduly burdensome conditions on their opportunity to appear on the general election ballot. The principle is unexception-

---

[19] Tex. Election Code, Art. 14.01.

able, cf. *Storer* v. *Brown, ante,* at 738, 739, 740, 746; but requiring independent candidates to evidence a "significant modicum of support"[20] is not unconstitutional. Demanding signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face, see *Jenness* v. *Fortson, supra,* and with a 500-signature limit in any event, the argument that the statute is unduly burdensome approaches the frivolous.

It is true that those who have voted in the party primaries are ineligible to sign an independent candidate's petition. In theory at least, the consequence of this restriction is that the pool of eligible signers of an independent candidate's petition, calculated by subtracting from all eligible voters in the 1972 primaries all those who voted in the primary and then adding new registrations since the closing of the registration books, could be reduced nearly to zero or to so few qualified electors that securing even 500 of them would be an impractical undertaking. But this likelihood seems remote, to say the least, particularly when it will be very likely that a substantial percentage, perhaps 25%, of the total registered voters will not turn out for the primary and will thus be eligible to sign petitions,[21] along with all new registrants

---

[20] *Jenness* v. *Fortson,* 403 U. S., at 442; see *supra,* at 782.

[21] This 25% approximation may actually be a conservative projection. Voting statistics compiled by the Office of Secretary of State indicate that 2,306,910 votes were cast for governor in the first 1972 Texas primaries of both parties and 2,036,770 in the runoff primary elections. As of January 31, 1972, the last date before the primaries on which aggregate statewide statistics are available, 3,872,462 voters had registered in Texas. Thus, without accounting for any increased registration by the time of the primaries, registered voter turnout ranged from approximately 60% to 53%, respectively. It is, of course, conceivable that some voters participating in the runoff primaries had not voted in the first primary, thereby raising to some figure higher than 60% those voters who were disqualified under Texas law from signing the nominating peti-

since the closing of the registration books prior to the primary. In any event, nothing in the record before us indicates what the total vote in the last election was in the districts at issue here, nothing showing what the primary vote would be or was in 1972, and nothing suggesting what the size of the pool of eligible signers might be. As the District Court noted, the independent candidates presented "absolutely no factual basis in support of their claims" that Art. 13.50 imposed unduly burdensome requirements. 349 F. Supp., at 1284. Dunn and Hainsworth relied solely on the minimal 500-signature requirement. This was simply a failure of proof, and

---

tions of independent candidates. We are nevertheless unwilling to assume based on the evidence before us that this would be such a high number of voters that independent candidates would be left with an insignificant pool of eligible voters to sign their petitions.

Comparative voting statistics on primary election participation in other States also suggest that the 25% estimate is modest. In California, for example, official figures reveal the following percentage of total registered voters at all party primaries for the past seven biennial elections:

| | |
|---|---|
| 1960 | 62.80% |
| 1962 | 63.53% |
| 1964 | 71.94% |
| 1966 | 64.67% |
| 1968 | 72.21% |
| 1970 | 62.23% |
| 1972 | 70.95% |

California Secretary of State, Statement of Vote, Consolidated Primary Election, June 6, 1972, p. 3.

The 1972 Democratic Party presidential primaries in Florida and Massachusetts witnessed voter turnout of approximately 59% and 56%, respectively. 30 Congressional Quarterly 481, 862, 1655 (1972). The realistic prospect of a postprimary pool of much higher than 25% is even greater in light of the fact that Texas has traditionally trailed behind national voter participation averages by a sizable margin. C. McCleskey, The Government and Politics of Texas 38 (4th ed. 1972).

for that reason we must affirm the District Court's judgments with respect to these appellants.[22]

## IV

In response to this Court's decision in *Bullock* v. *Carter,* 405 U. S. 134 (1972), invalidating the Texas filing-fee requirements, the state legislature enacted as a temporary measure the McKool-Stroud Primary Financing Law of 1972. Tex. Election Code, Art. 13.08c–1.[23] The statute

---

[22] The independent candidates also challenged the notary provision of Art. 13.51. Nothing that we have been shown, however, convinces us that the notarial requirement for independent candidates is more suspect or burdensome than that imposed upon the political parties. See *supra,* at 787.

[23] Since it was a temporary measure, this primary financing legislation has expired and it has been replaced by new legislation, the Primary Conduct and Financing Law of 1974. Tex. Election Code, Art. 13.08c–2 (Supp. 1974). This scheme provides for a schedule of candidate filing fees for access to the general primary election ballot. The filing fee is waived should the primary candidate file a nominating petition signed by a designated number of voters. Those filing fees paid to the county chairman of a political party holding a primary election are used to pay the party's primary expenses. Any remaining costs are defrayed by the State in accordance with a voucher system substantally identical to that provided in the McKool-Stroud Primary Financing Law of 1972 challenged by appellants. The new legislation is also comparable to its predecessor insofar as only those political parties required to conduct primary elections, which under recent amendments to the Texas Election Code are only those parties polling 20% or more of the vote cast for governor in the last general election, see n. 4, *supra,* are eligible for state funding.

The recent amendments to the 1972 financing law have not mooted this controversy. If appellants were correct that they had been unconstitutionally deprived of public financing for their 1972 qualification and nomination expenses, they might be able to compel the State to reimburse them. Under these circumstances and in view of the special nature of election challenges in general and this short-term funding measure in particular, we proceed to evaluate appellants' claims on the merits.

generally provided for public financing from state reve-
nues for primary elections of only those political parties
casting 200,000 or more votes for governor in the last
preceding general election. On its face, therefore, the
law precluded any payment of state funds to minor polit-
ical parties to reimburse them for the costs incurred in
conducting their nominating and ballot qualification
processes.[24]   In all, over $3,000,000 was appropriated by
the state legislature to the two major political parties to
defray their expenses in connection with the 1972 primary
elections. Brief for American Party of Texas 19–20,
n. 41.

The District Court rejected all constitutional challenges
to the law, noting that the statute was designed to com-
pensate for primary election expenses and that "[t]he
convention and petition procedure available for small or
new parties carries with it none of the expensive election
requirements burdening those parties required to conduct
primaries," 349 F. Supp., at 1285.   The District Court
also emphasized that in response to the State's argument
in Bullock v. Carter that state financing of primary elec-
tions would necessitate defining those political parties en-
titled to financial aid and would invite new charges of dis-
crimination, this Court pointed out that under Texas law
only those parties whose gubernatorial candidates received
more than 200,000 votes were required to conduct pri-
maries and said "[w]e are not persuaded that Texas
would be faced with an impossible task in distinguishing

---

[24] The American Party has alleged that by virtue of the State's
compulsory nominating and qualification procedures, it was forced
to incur extraordinary costs, including the printing of 12,000 sig-
nature sheets, payment of at least 50¢ as a statutory notary fee
for over 22,000 signatures, and expenditures for distributing, collect-
ing, and filing petitions.

between political parties for the purpose of financing primaries." 405 U. S., at 147.[25]

We affirm the judgment of the District Court. All political parties who desire ballot position, including the major parties, must hold precinct, county, and state conventions. See, *e. g.,* Tex. Election Code, Arts. 13.33, 13.34, 13.35, 13.38, 13.45, 13.45a, 13.47 (1967, Supp. 1973, Supp. 1974). The State reimburses political parties for none of the expenses in carrying out these procedures. New parties and those with less than 2% of the vote in the last election are permitted to nominate their candidates for office in the course of their convention proceedings. The major parties may not do so and must conduct separate primary elections. As we understand it, it is the expense of these primaries that the State defrays in whole or in part. As far as the record before us shows, none of these reimbursed primary expenses are incurred by minority parties not required to hold primaries. They must undergo expense, to be sure, in holding their conventions and' accumulating the necessary signatures to

---

[25] "Appellants strenuously urge that apportioning the cost among the candidates is the only feasible means for financing the primaries. They argue that if the State must finance the primaries, it will have to determine which political bodies are 'parties' so as to be entitled to state sponsorship for their nominating process, and that this will result in new claims of discrimination. Appellants seem to overlook the fact that a similar distinction is presently embodied in Texas law since only those political parties whose gubernatorial candidate received 200,000 or more votes in the last preceding general election are required to conduct primary elections. Moreover, the Court has recently upheld the validity of a state law distinguishing between political parties on the basis of success in prior elections. *Jenness* v. *Fortson, supra.* We are not persuaded that Texas would be faced with an impossible task in distinguishing between political parties for the purpose of financing primaries." 405 U. S., at 147 (footnote omitted).

qualify for the ballot, but we are not persuaded that the State's refusal to reimburse for these expenses is any discrimination at all against the smaller parties and if it is, that it is also a denial of the equal protection of the laws within the meaning of the Fourteenth Amendment. We are unconvinced, at least based upon the facts presently available, that this financing law is an "exclusionary mechanism" which "tends to deny some voters the opportunity to vote for a candidate of their choosing" or that it has "a real and appreciable impact on the exercise of the franchise." *Bullock* v. *Carter,* 405 U. S., at 144.

We should also point out that the appellant American Party mounts the major challenge to the primary financing law. The party, however, failed to qualify for the general election ballot; and we cannot agree that the State, simply because it defrays the expenses of party primary elections, must also finance the efforts of every nascent political group seeking to organize itself and unsuccessfully attempting to win a place on the general election ballot.

## V

Under Art. 5.05 (Supp. 1974) otherwise qualified voters in Texas may vote absentee in a primary or general election by personal appearance at the county clerk's office or by mail. It is the State's practice, however, to print on the absentee ballot only the names of the two major, established political parties, the Democrats and the Republicans. *Raza Unida Party* v. *Bullock,* 349 F. Supp., at 1283–1284.

The District Court sustained the exclusion of minority parties from the absentee ballot, relying on the presumption of constitutionality of state laws, *McDonald* v. *Board of Election Comm'rs,* 394 U. S. 802 (1969), and the rationality of not incurring the expense of printing absentee ballots for parties without substantial voter

support. The Socialist Workers Party, however, satisfied the statutory requirement for demonstrating the necessary community support needed to win general ballot position for its candidates, and with respect to this appellant, the unavailability of the absentee ballot is obviously discriminatory. The State offered no justification for the difference in treatment in the District Court, did not brief the issue here, and had little to say in oral argument to justify the discrimination.

We have twice since *McDonald* v. *Board of Election Comm'rs* dealt with alleged discriminations in the availability of the absentee ballot, *Goosby* v. *Osser,* 409 U. S. 512 (1973); *O'Brien* v. *Skinner,* 414 U. S. 524 (1974). From the latter case, it is plain that permitting absentee voting by some classes of voters and denying the privilege to other classes of otherwise qualified voters in similar circumstances, without affording a comparable alternative means to vote, is an arbitrary discrimination violative of the Equal Protection Clause. Plainly, the District Court in this case employed an erroneous standard in judging the Texas absentee voting law as it was applied in this case. We therefore vacate the judgment of the District Court in No. 72–887 in this respect and remand the Socialist Workers Party case to the District Court for further consideration in light of *Goosby* v. *Osser* and *O'Brien* v. *Skinner.* In all other respects, that judgment is affirmed, as is the judgment in No. 72–942.

*So ordered.*

MR. JUSTICE DOUGLAS, dissenting in part.

While I agree with the Court on the absentee ballot aspect of these cases, I dissent on the main issue. These cases involve appeals from the dismissal of actions seeking declaratory and injunctive relief against provisions of the Texas Election Code relating to

minority parties and independent candidates. The District Court noted that:

> "While the Supreme Court of the United States has delineated on the extreme end of the spectrum those combinations of restrictions which unconstitutionally impede the election process [*Williams* v. *Rhodes,* 393 U. S. 23 (1968)], and those on the other end which do not [*Jenness* v. *Fortson,* 403 U. S. 431 (1971)], this case presents a new combination which falls squarely in the middle." *Raza Unida Party* v. *Bullock,* 349 F. Supp. 1272, 1275–1276 (WD Tex. 1972).

The hurdles facing minority parties such as the American Party of Texas in seeking to place nominees on the ballot are set out and compared with those of *Jenness* v. *Fortson,* 403 U. S. 431, in my opinion dissenting from the denial of a temporary restraining order in *American Party of Texas* v. *Bullock,* 409 U. S. 803.[1]  I there noted that:

> "We said in *Jenness* v. *Fortson, supra,* at 438, 'Georgia's election laws, unlike Ohio's, do not operate to freeze the status quo.' Texas, though not as severe as Ohio, works in that direction. It therefore seems to me, at least prima facie, to impose an

---

[1] As I there noted, minority parties whose gubernatorial candidate in the last election polled more than 2% of the total votes cast but less than 200,000 were allowed to select candidates through either primaries or nominating conventions. Tex. Election Code, Art. 13.45 (1) (Supp. 1972). The law has since been changed so that a minority party which fielded a gubernatorial candidate who polled more than 2% of the vote in the last election may not select candidates through primaries but must nominate through conventions unless the gubernatorial candidate polled more than 20% of the vote. Texas S. B. No. 11, 63d Legislature, Regular Session, § 6 (1973), quoted in Supplemental Appendix to Brief for American Party of Texas 14–15.

invidious discrimination on the unorthodox political group.

"Perhaps full argument would dispel these doubts. But they are so strong that I would grant the requested stay . . . ." *Id.*, at 806.

Oral argument has failed to dispel the doubts. For the reasons stated in *American Party of Texas* v. *Bullock, supra,* I believe that the totality of the requirements imposed upon minority parties works an invidious and unconstitutional discrimination.

An analysis of the requirements imposed on independent candidates leads me to the same conclusion.[2]   Under

---

[2] The requirements for independent candidates are set forth in Tex. Election Code, Art. 13.50 (1967):

"The name of a nonpartisan or independent candidate may be printed on the official ballot in the column for independent candidates, after a written application signed by qualified voters addressed to the proper officer, as herein provided, and delivered to him within thirty days after the second primary election day, as follows:

"If for an office to be voted for throughout the state, the application shall be signed by one per cent of the entire vote of the state cast for Governor at the last preceding general election, and shall be addressed to the Secretary of State.

"If for a district office in a district composed of more than one county, the application shall be signed by three per cent of the entire vote cast for Governor in such district at the last preceding general election, and shall be addressed to the Secretary of State.

"If for a district office in a district composed of only one county or part of one county, the application shall be signed by five per cent of the entire vote cast for Governor in such district at the last preceding general election, and shall be addressed to the Secretary of State.

"If for a county office, the application shall be signed by five per cent of the entire vote cast for Governor in such county at the last preceding general election, and shall be addressed to the county judge.

"If for a precinct office, the application shall be signed by five per cent of the entire vote cast for Governor in such precinct at the

the procedures reviewed in *Jenness,* independent candidates seeking a ballot position had six months to secure the signatures of 5% of the eligible electorate for the office in question. The percentage required in Texas ranges, according to the office, from 1% of the last statewide gubernatorial vote to 5% of the last local gubernatorial vote, and in any case no more than 500 signatures are required; the candidate, however, has only 30 days in which to gather them. In *Jenness* a voter could

last preceding general election, and shall be addressed to the county judge.

"Notwithstanding the foregoing provisions, the number of signatures required on an application for any district, county, or precinct office need not exceed five hundred.

"No application shall contain the name of more than one candidate. No person shall sign the application of more than one candidate for the same office; and if any person signs the application of more than one candidate for the same office, the signature shall be void as to all such applications. No person shall sign such application unless he is a qualified voter, and no person who has voted at either the general primary election or the runoff primary election of any party shall sign an application in favor of anyone for an office for which a nomination was made at either such primary election.

"The application shall contain the following information with respect to each person signing it: his address and the number of his poll tax receipt or exemption certificate and the county of issuance; or if he is exempt from payment of a poll tax and not required to obtain an exemption certificate, the application shall so state.

"Any person signing the application of an independent candidate may withdraw and annul his signature by delivering to the candidate and to the officer with whom the application is filed (or is to be filed, if not then filed), his written request, signed and duly acknowledged by him, that his signature be cancelled and annulled. The request must be delivered before the application is acted on, and not later than the day preceding the last day for filing the application. Upon such withdrawal, the person shall be free to sign the application of another candidate for the same office. Acts 1951, 52nd Leg., p. 1097, ch. 492, art. 227; as amended Acts 1963, 58th Leg., p. 1017, ch. 424, § 104."

sign a candidate's petition even though he had already signed or would sign others. Here no voter may sign the application of more than one candidate. In *Jenness* a voter who signed the petition of an independent was free thereafter to participate in a party primary and a voter who previously voted in a party primary was fully eligible to sign a petition. Here independents are not even allowed to seek signatures until after the major party primaries, and no voter who has participated in a party primary is allowed to sign an independent candidate's application. In *Jenness* no signature on a nominating petition had to be notarized, but that is not the case here.

In *Jenness* we were able to say that Georgia "has insulated not a single potential voter from the appeal of new political voices within its borders." 403 U. S., at 442. In Texas, however, the independent, like the minority party, must "draw [his] support from the ranks of those who [are] either unwilling or unable to vote in the primaries of the established parties." *American Party of Texas* v. *Bullock*, 409 U. S., at 806. As with minority parties, I do not believe that Texas may constitutionally leave independent candidates to "be content with the left-overs to get on the ballot." *Ibid.*