**SOCIALIST WORKERS PARTY et al., and Florence Luscomb et al., Plaintiffs,**

v.

**John F. X. DAVOREN, as Secretary of the Commonwealth of Massachusetts, with his Agents and Successors in Office, Defendants.**

**Civ. A. No. 74–1101–C.**

United States District Court,
D. Massachusetts.

June 28, 1974.

---

78. See Part 5, *supra*.

79. *Cf.* Note, Executive Clemency, *supra* note 37, at 178–82.

Jeffrey A. Denner, Saul A. Schapiro, Cambridge, Mass., for plaintiffs.

Kenneth A. Behar, Asst. Atty. Gen., Boston, Mass., for defendants.

Before CAMPBELL, Circuit Judge, CAFFREY, Chief District Judge, and JULIAN, District Judge.

## OPINION

LEVIN H. CAMPBELL, Circuit Judge.

The Socialist Workers Party, its candidates for Governor, Lieutenant Governor, and other offices in Massachusetts, and persons seeking to represent the class of citizens desiring to vote for Socialist Workers Party candidates [collectively SWP], brought this action seeking an injunction against the operation of several Massachusetts statutes. Violations of four United States constitutional amendments and 42 U.S.C. §§ 1981, 1983 and 1988 are alleged. Jurisdiction is predicated on 28 U.S.C. §§

1331(a), 1343(3) and 1343(4). A three-judge court was convened pursuant to 28 U.S.C. § 2281, and argument was heard on June 24, 1974, on SWP's motion for a preliminary injunction and defendant's motion to dismiss the complaint or, in the alternative, for summary judgment. We grant summary judgment to defendant.

The relevant facts are undisputed; we take them from affidavits and exhibits filed by both sides and from the verified complaint including the state's official compilation of election returns for the 1970 and 1972 elections. The SWP is a political party that has regularly nominated candidates for office in a number of states. *See, e. g.,* American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 1301 n. 2, 39 L.Ed.2d 744 (1974). SWP placed candidates on the Massachusetts ballot for the first time in 1972, including one candidate for Senator who received 41,369 votes, or approximately 1.65 percent of all votes cast for Senator in that election. The SWP ran, among others, a write-in candidate for governor in 1970; however, no official vote total for that candidate is available. Because the total vote in the 1970 gubernatorial contest was 1,-867,906, the number of votes received by the SWP candidate in the 1972 senatorial race, the most recent comparative figure available, would have been approximately 2.21 percent of the votes cast in the 1970 election.

The SWP challenges in this action the Massachusetts statutes governing access to the ballot, and seeks an injunction ordering defendant not to print ballots for the forthcoming November election unless the SWP candidates are included thereon. Under M.G.L. c. 50, § 1, any political group the candidate of which received more than three percent of the vote in the "preceding biennial state election . . . for governor" is a "political party." A political party is entitled to nominate and place its candidates on the ballot for future elections without further evidence of support, so long as it continues to receive the three percent of the total vote necessary to retain its "party" status. The freedom from the need to show additional support is not an unmixed blessing: a political party is subject to considerable state regulation of its affairs, M.G.L. c. 52, and must select its candidates by a statewide primary, M.G.L. c. 53, as amended by cc. 110 & 429, Acts of 1973.

Those groups the candidate of which fails to attract the necessary support must demonstrate support by collecting signatures on nomination papers or petitions. M.G.L. c. 53, § 6, as amended by c. 849 of the Acts of 1973, provides that

"[n]ominations of candidates for any offices to be filled at a state election may be made by nomination papers . . . signed in the·aggregate by not less than such number of voters as will equal two percent of the entire vote cast for governor at the preceding biennial state election in the commonwealth at large or in the electoral district or division for which the officers are to be elected; . . ."

Every voter may sign "as many nomination papers for each office as there are persons to be elected thereto, and no more." M.G.L. c. 53, § 7. There is apparently no requirement in Massachusetts law that the signers of the SWP petitions be unaffiliated with opposing political groups. The signatures do not have to be notarized.

Once the petitions are secured, they must be sorted by the political group and submitted to the registrars of the city or town in which each signer resides. The local officials are required to certify on the nomination paper whether the signer is qualified to sign. Nomination papers must then be submitted, after their certification, to the Secretary of State for statewide offices, and to the city or town clerk for local offices. For the 1974 election, to be held on November 5, the preliminary submission to the local registrars must occur by June 25, 1974, and the final filing with the Secretary of State by July 2, 1974. This is considerably in advance of the state

primaries, which are held on September 6 and elect the representatives of the "political parties."

SWP does not challenge the advanced date by which the petitions must be filed. Nor does it challenge the quantity of signatures, two percent, that it must gather. The claims made are three:

(1) That the reference in the state statutes at two places to the preceding "biennial" gubernatorial election is vague, and a restriction on first amendment freedoms;

(2) That the distinction between the three percent of the vote necessary to qualify as a political party, and the two percent necessary to nominate by petition, is unsupported by a compelling state interest, and is a restriction on the franchise and invidiously discriminates "in favor of the established Republican and Democratic parties";

(3) That the requirement of submission of the nomination papers to the local registrars is unduly burdensome to the SWP and is not justified by a compelling state interest. We consider these challenges seriatim.

I

The alleged vagueness in the two statutes referring to the "biennial" gubernatorial election was generated when, in 1964, Article 64 of the Massachusetts Constitution was amended (Art. 82 of Amendment) to change the previously biennial gubernatorial elections to quadrennial elections. M.G.L. c. 50, § 1, which predated the constitutional amendment and referred to the then extant biennial elections, has never been amended to conform. Moreover, and without apparent reason, the 1973 amendment to c. 53, § 6, refers to biennial elections, even though at the time of the statute's enactment there were no longer such elections.[1]

SWP contends that this disjunction between the statutes and the constitution renders the statutes void for vagueness because "no adequate notice as to the number of votes/signatures actually required for statutory compliance is provided." Because this vagueness involves the exercise of the franchise, SWP contends, the normal, stringent First Amendment scrutiny should be applied and the statute found wanting. We disagree.

Defendant Secretary of State of the Commonwealth stated publicly in 1970, and has circulated materials to the effect, that the two statutes refer to the most recent gubernatorial election. A letter was sent to the SWP specifying the number of signatures SWP candidates would need. These statements make definite and ascertainable the number of votes or signatures required to attain a position on the ballot. The Secretary is the state official ultimately charged with administration of the election laws; his statement of position is definitive unless a state court, or the state Attorney General, M.G.L. c. 12, § 9, should disagree. The Assistant Attorney General representing defendant stated to us at oral argument that the Attorney General agrees with the Secretary's interpretation of the statutes and we know of no state court interpretation.

There is therefore no uncertainty concerning what the relevant state officials require of SWP. To the extent SWP has any complaint, it is that the interpretation rendered is deficient as a matter of state law.[2] SWP

---

1. In fairness to the Commonwealth we should point out that the Massachusetts Constitution, Art. 91, does create the possibility of a biennial gubernatorial election if one is necessary to fill a vacancy in office. However, it would not be likely that the 1973 amendment intended to fix the number of petitions needed by reference to a vacancy-filling election that might never occur.

2. We confess to puzzlement at what SWP hopes to attain by arguing that the state interpretation is deficient as a matter of state law. The question for resolution is whether the legislature was primarily interested in "biennial," thus making sure that figures from the most recent election would be used, or in "gubernatorial," thus assuring that figures from the most representative statewide elec-

sought to add, at oral argument, the contention that the policy expressed in the state statutes is "so important" that state administrative officials, and even state courts, lack power to construe them, and that therefore we must judge vagueness on the statutes' face. But this argument, too, is purely one of state law. Although the constitutional claim discussed in Part II *infra* would perhaps give us pendent jurisdiction over these issues of state law, *see* Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), we believe that the state issues here are better left to the state courts. We decline to exercise whatever pendent jurisdiction we may have. Whichever way the state questions are resolved, no federal issues are raised; we would have a true "vagueness" claim only were SWP actually left in the dark about how it must go about qualifying for the ballot. Here, since SWP has been told exactly what it must do, it is reduced to the argument far removed from vagueness that the state officials have simply told it to do what it characterizes as the wrong thing.

## II

The argument that the established political parties are unconstitutionally entrenched by the difference between the 3% of the vote needed to qualify as a "political party," and the 2% by way of petitions necessary to qualify an individual candidate, although

perhaps not yet treated by the Supreme Court to a ritual burial, has been decapitated by Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), and by American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

SWP argues, in effect, that there is no meaningful difference between the functions of the three percent and the two percent figures and that, therefore, when the state determined that its interests in the integrity of its ballot would be secured by the two percent signature requirement, it was conceding that there was no "compelling" interest to be served by the three percent line for qualification as a political party. SWP therefore requests us to take notice that it has scored an ersatz two percent figure, *see* n. 2 *supra*, and order defendant to ignore the statute and place SWP on the ballot. We believe the Supreme Court has already given its answer.

> "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, . . ." *Jenness, supra*, 403 U.S. at 442, 91 S.Ct. at 1976.

In *Jenness* the Court considered a Georgia scheme in which any political group garnering 20% of the vote in an earlier election would gain the status of political party, and all others would be required to acquire the signatures of five percent of the electorate before they would be placed on the ballot. The

---

tion would be used. The statutes can be harmonized with the constitution only by reading either "biennial" or "gubernatorial" out of them. Defendant chose to read out "biennial," apparently following the constitutional change while preserving assurance that the reference figures would be from a representative statewide election. (Some election years, such as 1980, will have neither gubernatorial nor senatorial elections.) If SWP were to succeed in having "gubernatorial" eliminated from the statute, the reference to the most recent biennial state election would require use of the figures from the 1972 senatorial contest, which attracted 2,503,494 votes. This is 635,-588 more than the 1,867,906 who voted in the 1970 gubernatorial race. The change hardly seems advantageous to SWP, because it would

require them to gather even more nomination papers. If the Secretary were instructed to refer to the last "true" biennial gubernatorial election, that of 1966, he would use a reference base of 2,140,200 votes—again more than the number of votes cast in the 1970 election. SWP gains only if it can effect an unlikely combination: use of the SWP vote in 1972, computed against the vote of 1970, to give SWP a phantom percentage of 2.21% in an election in which it did not participate. This phantom vote would be joined with the declaration SWP seeks that 2% of the vote is sufficient to give it status as a political party entitled to a ballot position. As appears *infra* we do not go this second mile, so there is no need to traverse the first.

Court upheld the state's program. Although the major issue in that case was the validity of the five percent requirement, the Court was alert to the difference between the treatment of political parties and that of newcomers. The Court examined the entire "system" and found "nothing" abridging constitutional rights. *Id.* at 440, 91 S.Ct. 1970. Addressing an argument similar to that pressed by SWP before us, the Court said:

"The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other." *Id.*, at 441, 91 S.Ct. at 1976.

The Court even intimated that the claim of constitutional violation, were ever one tenable, should be made by the political party which was being forced to maintain an elaborate superstructure, conduct a primary, and so on, when none of these requirements are placed on other political groups. Moreover, the candidates of the political party who lost in the primary would have a claim of discrimination because they were beaten by their rivals and could no longer run, whereas a non-party candidate had "only" to gather signatures instead of defeating rivals at the polls to gain a place on the ballot.

In *American Party, supra,* a scheme closer to the Massachusetts plan was discussed. Any political group gathering more than 200,000 votes in the last gubernatorial election was assured a position on the ballot, but required to select its candidates by primary. Any party gathering more than two percent of the gubernatorial vote, but fewer than 200,000 votes, was allowed to nominate by either primary or convention. It also was assured a place on the ballot.

Those groups the candidate of which attracted less than two percent were not assured a ballot position and were required to gather, by local conventions or by petition, notarized signatures equalling one percent of the previous gubernatorial vote. This was the same type of distinction that characterizes the Massachusetts system.

The Court rejected the argument that it was discriminatory to use these percentage differences to require some parties to nominate by convention rather than by primary, stating that it could not even take the argument seriously. *Id.*, 94 S.Ct. at 1306. In directly discussing the different routes to the ballot, the Court stated:

"Texas has provided alternative routes to the ballot—statewide primaries and precinct conventions [plus nominating petitions]—and it is problematical at best which is more onerous in fact. It is sufficient to note that the system does not create or promote a substantial imbalance in the relative difficulty of each group to qualify for the ballot." *Id.* at 1307 n. 16.

We see no meaningful difference between the Texas system approved by the Court and the Massachusetts system challenged here. Both allow minority parties access to the ballot—as evidenced by SWP's success in 1972.[3] Both entail some difference in the treatment of political parties and political groups, balancing the different qualification standards against the different burdens imposed. Neither operates effectively to exclude minority parties.

"In sum, [the state] 'in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life.' Jenness v. Fortson, *supra,* 403 U.S., at 439 [91 S.Ct., at 1975]. It affords minority political parties a real and essentially equal op-

---

3. The only difference between the Texas and Massachusetts systems material here is that Texas required a qualification standard one percent less than that of Massachusetts. However, the difference does not affect the result, because neither the three percent of the vote standard, nor the two percent by petition standard, exceeds the five percent upheld in Storer v. Brown, —— U.S. ——, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), and *Jenness, supra.*

portunity for ballot qualification. Neither the First and Fourteenth Amendments nor the Equal Protection Clause require any more." *American Party, supra* at 1309.

### III

SWP attacks the filing requirement of M.G.L. c. 53, § 7, as "an excessively expensive, time consuming provision which seriously burdens Plaintiff's First Amendment rights of access to the ballot without a countervailing compelling state interest." We do not agree.

A SWP affidavit summarizes the burden of the filing: nomination papers are likely to be collected from residents of more than 300 localities. They must be separated by locality, delivered, and later retrieved for redelivery to the Secretary of State. Because the localities are scattered throughout the state, a trip to all of them would be burdensome. In the 1972 organization campaign filings were effected in only 187 towns, thus foregoing the benefit of signatures from additional towns. Travelling time spent to transport those papers actually filed exceeded 250 man-hours, and more than 3,200 miles were travelled, at a not inconsiderable cost in gasoline, tolls, and other automobile expenses.

However, to state the problem in this way reveals its difficulties. The same affidavit states that out of pocket expenses necessary to gather the nomination papers from 2% of the voters exceed $2,500, that opportunity costs to volunteers exceed $20,000, and that more than 6,681 person-hours have been devoted to the chore. The marginal increment required by compliance with M.G.L. c. 53, § 7, is not great; it is certainly less than the increment in effort that would be effected were Massachusetts to require signatures of 5%, as *Jenness* would permit, rather than 2% of the voters. Moreover, although an exact comparison is impossible, these requirements are probably less onerous than the requirement, approved in *American Party, supra*, 94 S.Ct. at 1309, that all of the nomination signatures be notarized.

 The Massachusetts requirement seems to serve weighty state interests. The preliminary submission to the local registrar apparently makes it possible to ascertain whether the signer is a registered voter residing at his claimed address, that the signature is not a forgery, and that the individual has not signed more than one petition for a single office. SWP recognizes that these activities by local registrars are crucial to maintaining the integrity of the ballot, but would have us compel the state to shoulder the collation, distribution and transportation burden. SWP argues that, because the state bears the costs of validation, it must bear the costs of making validation possible. The argument is a non sequitur. It is no more than a plea for additional subsidy of the nomination process, based on the observation that it is already partly subsidized. We uphold the requirement: it is no more burdensome, singly or in combination with all other requirements, than many the Supreme Court has previously upheld.

Injunctive relief is denied and summary judgment is granted to defendant.