687 F.2d 1375
 Anatoly ARUTUNOFF, Kathie M. Lee, Beverly Chansolme, Bob
Miller, Tom Laurent, Paul Woodard, Jim Sessions,
Thomas G. Winter, Dan Phillips, Lynn
Crussel, and Gordon Mobley,
Plaintiffs-Appellants,
v.
The OKLAHOMA STATE ELECTION BOARD; Grace Hudlin, Chairman of
the Oklahoma State Election Board; Drew Neville,
Vice-Chairman of the Oklahoma State Election Board; and Lee
Slater, Secretary of the Oklahoma State Election Board,
Defendants-Appellees.
 No. 81-1379.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 3, 1982.
 
 James C. Linger and Michael L. Seymour of Butler, Steinke & Linger, Tulsa, Okl., for plaintiffs-appellants.
 James B. Franks, Asst. Atty. Gen., Oklahoma City, Okl. (Jan Eric Cartwright, Atty. Gen. of Okl., Gary W. Gardenhire, Asst. Atty. Gen., Chief, Civ. Div., and Michael F. Fouts, Asst. Atty. Gen., Oklahoma City, Okl., with him on the brief), for defendants-appellees.
 Before McWILLIAMS, SEYMOUR and BREITENSTEIN, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 
 
 1
 Eleven persons, all residents of the State of Oklahoma and registered members of the Libertarian Party of Oklahoma, brought a class action suit pursuant to 42 U.S.C. § 1983 (1976) against the Oklahoma State Election Board and various Oklahoma election officials, claiming that their rights under the first and fourteenth amendments to the United States Constitution were about to be violated by the defendants acting under the color of state law. The plaintiffs' request for a preliminary and permanent injunction was denied. Upon trial, the district court denied the plaintiffs' request for declaratory, injunctive and other relief, and dismissed the cause of action. Plaintiffs appeal. We affirm.
 
 
 2
 On June 13, 1980, the Libertarian Party in the State of Oklahoma gained status as an officially-recognized political party in Oklahoma, having filed with the Oklahoma State Election Board a petition bearing the requisite number of valid signatures of registered voters as required by Okla.Stat. tit. 26, § 1-108 (1971 & Supp. 1974), i.e., five percent of the total votes cast for the office of Governor of Oklahoma in the general election of 1978. The members of the Libertarian Party then were allowed to register as Libertarians and the party itself nominated candidates for elective offices to be filled at the general election on November 4, 1980.
 
 
 3
 At the 1980 general election, the Libertarian Party's nominee for President of the United States received only 1.2 percent of the total Oklahoma vote for that office. Okla.Stat. tit. 26, §§ 1-109, -110 (1971 & Supp. 1974) provide, inter alia, that any recognized political party whose nominee for President fails to receive at least ten percent of the total votes cast for that office shall cease to be recognized as an official political party in the State of Oklahoma and that the party affiliation of those persons registered as members of that formerly-recognized party shall be changed to that of "Independent." Under Oklahoma law, state election officials were therefore required to recognize the Libertarian Party's poor showing in the general election by decertifying the party and its members. Seeking to prevent this state action, and apparently unwilling to go through the petition procedure necessary to re-establish itself as an official political party, the Libertarian Party filed the present action on November 7, 1980. The Libertarians sought to enjoin the Oklahoma election officials from decertifying the Libertarian Party of Oklahoma and from removing from the voter rolls the party affiliation of members of the Libertarian Party and changing the party affiliation to Independent.
 
 
 4
 As indicated, upon trial, the trial judge held in favor of the defendants and dismissed the lawsuit. By subsequent action of the defendants, the Libertarian Party of Oklahoma has now ceased formally to exist, and its members have been designated as Independents. It is from the dismissal of their civil rights action that the plaintiffs appeal.
 
 
 5
 The plaintiffs frame the issues on appeal as follows:
 
 
 6
 (1) Okla.Stat. tit. 26, § 1-109 (1971 & Supp.1974), which provides, inter alia, that a recognized political party whose nominee for President of the United States fails to receive at least ten percent of the total votes cast for that office shall cease to be a recognized political party, is not framed in the least restrictive manner necessary to achieve legitimate state aims in regulating ballot access, and therefore is violative of plaintiffs' rights under the first and fourteenth amendments;
 
 
 7
 (2) Okla.Stat. tit. 26, § 1-110 (1971 & Supp.1974), which provides, inter alia, that the registered party affiliation of a member of a political party which ceases to be recognized as such shall be changed to "Independent," also is violative of plaintiffs' first and fourteenth amendment rights; and
 
 
 8
 (3) Okla.Stat. tit. 26, § 5-112 (1971 & Supp.1978) and Okla.Stat. tit. 26, § 10-101.1 (1971 & Supp.1977), relating to independent candidates for office, violate plaintiffs' first and fourteenth amendment rights because the statutes in question discriminate in favor of independent candidates for office and against third party candidates for office.
 
 
 9
 A state has a legitimate interest in requiring a showing of a "significant modicum of support" before it prints on the state election ballot the name of a political party and its slate of candidates. This serves the important state interest of avoiding "confusion, deception, and even frustration of the democratic process at the general election." Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). Furthermore, the states "have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." Clements v. Fashing, --- U.S. ----, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). Thus, reasonable level-of-support requirements and classifications that turn on the political party's success in prior elections are not constitutionally infirm, per se. Id. A state's election laws, however, cannot operate so as to freeze the political status quo. They must recognize the fact that there is a constant fluidity in the fortunes of political parties, particularly minor political parties. Thus, the courts have invalidated state ballot access laws that are oppressive and make it virtually impossible for any but the two major parties to achieve ballot positions for their candidates. Williams v. Rhodes, 393 U.S. 23, 25, 89 S.Ct. 5, 7, 21 L.Ed.2d 24 (1968); McLain v. Meier, 637 F.2d 1159, 1163 (8th Cir. 1980).
 
 
 10
 In Oklahoma, a new political party can be formed at any time, except during the period between July 1 and November 15 of any even-numbered year. Party formation is accomplished by the filing of a petition seeking recognition of such party. The petition must bear the signatures of registered voters equal to five percent of the total votes cast in the preceding general election for either President or Governor.* Once recognized, the political party may present a slate of candidates whose names will appear on the ballot at the general election. Under Oklahoma law, however, any recognized political party whose candidate for either President or Governor fails to receive at least ten percent of the total votes cast for such office ceases to be a recognized political party, and thereafter it may regain recognition only by following the procedures prescribed for formation of new political parties. Once a recognized political party officially ceases to exist because of its failure to meet the ten percent requirement, its members are reclassified as Independents.
 
 
 11
 The issue here presented is whether these Oklahoma ballot access restrictions unduly burden the plaintiffs' first and fourteenth amendment rights to political association and ballot access. After careful examination of the challenged statutes, we have determined that these Oklahoma election laws can withstand close scrutiny, that they advance compelling state interests, and that they accomplish important state goals without unduly burdening the constitutional rights of political parties and their members. We are thus in accord with the trial court's judgment.
 
 
 12
 The United States Supreme Court has written extensively on the subject of state election laws and the restraints which the United States Constitution imposes thereon, starting with Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), and following with such cases as Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); and Clements v. Fashing, --- U.S. ----, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). From our reading of those cases, we fail to perceive any hard-and-fast general rule or standard by which to measure state ballot access laws. In our view, it would appear that each case must be resolved on its own facts after due consideration is given to the practical effect of the election laws of a given state, viewed in their totality. See Clements v. Fashing, --- U.S. ----, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). If, for example, the ballot access restrictions of a state's election laws are deemed by the judiciary to be unnecessarily oppressive, the courts have declared such laws to be unconstitutional. See McLain v. Meier, 637 F.2d 1159, 1163 (8th Cir. 1980).
 
 
 13
 In the instant case, we conclude that Oklahoma's ballot access election laws are not unduly oppressive. In our view, to require a new political party to demonstrate that it has some degree of political support by obtaining the signatures of registered voters equal to five percent of the total votes cast in the preceding general election for either President or Governor is not unreasonable. Similarly, to require a political party to garner ten percent of the votes cast in an election in which it had candidates as a prerequisite to continuing recognition as a political party is not unconstitutional, per se. Moreover, once a recognized political party ceases to exist, it would follow that its members can no longer be carried on the voter rolls as registered members of such defunct party. And, of course, even though a political party has ceased officially to exist because of its failure to meet the ten percent requirement, its members thereafter can regain recognition by following the petition procedures prescribed for the formation of a new political party, which, in the instant case, the Libertarians of Oklahoma did in 1980.
 
 
 14
 Earlier Oklahoma statutes, which have been repealed, provided that any political party could gain official recognition through the presentment of a petition bearing the names of 5000 registered voters, Okla.Stat. tit. 26, § 229 (repealed 1975), and that a recognized political party would cease to exist if it failed to receive ten percent of the votes cast for the party receiving the highest number of votes at the two preceding general elections, Okla.Stat. tit. 26, § 111 (repealed 1975). Counsel argues that these repealed statutes demonstrate that there is a way of governing minor political parties which is less restrictive than the means prescribed by present statutes. We are not impressed with this argument. Admittedly, the repealed statutes are somewhat less restrictive than the present statute, although, in our view, not markedly so. We do not believe, however, that such fact, standing alone, requires a reversal. The ultimate test is whether the particular election laws under attack, when considered in connection with other related election laws, unduly encourage maintenance of the political status quo or are oppressive to a degree that stifles the exercise of first amendment rights. As indicated, we do not believe the present laws to be constitutionally infirm.
 
 
 15
 In this general connection, we note that at the general election held in 1980, the Libertarian Party in Oklahoma received only 1.2 percent of the total votes cast for the office of President. This being the case, if the plaintiffs are to obtain ultimate relief in the present proceeding, as concerns decertification, it is necessarily their position that any election law requirement is unconstitutional if it demands that a recognized political party receive more than 1.2 percent of the total votes cast as a condition for continuing as a recognized political party.
 
 
 16
 The Libertarians also argue that, under Oklahoma law, minor political parties are dealt with differently than independent candidates and that such discrimination violates their fourteenth amendment rights. In this regard, counsel points out that in order to gain recognition as a political party, the Libertarians in Oklahoma must present a petition bearing the signatures of five percent of the total votes cast in the last general election for either President or Governor, Okla.Stat. tit. 26, § 1-108 (1971 & Supp.1974), whereas a would-be independent candidate for state office need only file a petition signed by five percent of all registered voters, or, alternatively, by paying a filing fee, Okla.Stat. tit. 26, § 5-112 (1971 & Supp.1978). We are not persuaded by this argument. A political group becoming a recognized political party and offering to the electorate a slate of candidates is far different than one individual becoming an independent candidate to run for a particular office. As stated in Storer v. Brown, 415 U.S. 724, 745, 94 S.Ct. 1274, 1286, 39 L.Ed.2d 714 (1974), "the political party and the independent candidate approaches to political activity are entirely different." It is our view, therefore, that the states need not treat minor political parties and independent candidates identically in order for state laws to withstand constitutional challenge.
 
 
 17
 Judgment affirmed.
 
 
 18
 SEYMOUR, Circuit Judge, dissenting.
 
 
 19
 I am unable to concur in the majority opinion for the reasons set out below.
 
 
 20
 The challenged statutes, which took effect in 1975, substantially restrict the ability of a minority party to gain recognized status. Recognition is a legal prerequisite to a party's ability to place candidates on the ballot for state elections. Prior to 1975, Oklahoma required a new political party to submit a petition containing the names of 5,000 voters in order to field candidates for office. Okla.Stat. tit. 26, § 229 (1971), repealed by 1974 Okla.Sess.Laws ch. 153, § 17-114. Under the new law, the party must obtain signatures equalling five percent of the total votes cast in the last general election. Okla.Stat. tit. 26, § 1-108 (Supp.1975).[1] Since 1974, between 770,000 and 1,150,000 people have voted in each general election. Oklahoma Election Board, Directory of Oklahoma 1981 at 652. Therefore, a new political party now must collect well over 35,000 signatures to gain recognition.
 
 
 21
 The Oklahoma gubernatorial election occurs every four years, alternating every two years with the presidential general election. Because voter turnout is historically much higher for presidential general elections, the new law has substantially restricted a minority party's ability to field candidates in a gubernatorial general election. For example, recognition in 1982, a gubernatorial election year, would require 57,485 signatures (based on total votes in the previous presidential election), while recognition in 1980, a presidential election year, required 38,870 (based on total votes in the previous gubernatorial election). Id.
 
 
 22
 The ability of a party to retain official status is also restricted. Under the former statute, a political party ceased to exist if in two consecutive general elections it received less than ten percent of the votes cast for the party receiving the highest number of votes. Okla.Stat. tit. 26, § 111 (1971), repealed by 1974 Okla.Sess.Laws ch. 153, § 17-114. Under the new law, the minority party's nominee for Governor or President must receive ten percent of the total votes cast for said office in the general election in order for the minority party to retain its status.[2] Okla.Stat. tit. 26, § 1-109 (Supp.1975). If a minority party fails to retain its recognized status, no voters may register as members of that party and the affiliation of all registered members is changed to Independent. Okla.Stat. tit. 26, § 1-110 (Supp.1975).
 
 
 23
 The threshold issue in this case is the level of judicial scrutiny to which these Oklahoma election laws must be subjected. Ballot access restrictions burden two fundamental rights protected by the Constitution, the right to political association and the right to cast votes effectively. Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979) (citing Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968)). The Supreme Court has held that when such "vital individual rights are at stake," the state must establish a "compelling interest" and must "adopt the least drastic means to achieve (its) ends." Id. 440 U.S. at 184-85, 99 S.Ct. at 990-91; accord McLain v. Meier, 637 F.2d 1159, 1163 (8th Cir. 1980). This is the traditional articulation of strict judicial scrutiny that is applied when state laws burdening fundamental rights are analyzed.
 
 
 24
 The recent Supreme Court opinion of Clements v. Fashing, --- U.S. ----, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), cited by the majority opinion, is not a retreat by the Court from the use of strict scrutiny in voter access cases. Part V of that opinion, representing the Opinion of the Court, concluded that the First Amendment interests there at stake were so insignificant as to be de minimus. Therefore the restrictions could be "upheld consistent with traditional equal protection principles." Id. 102 S.Ct. at 2848. The burdens imposed by the Oklahoma statutes on the First Amendment rights in this case are not similarly insubstantial.
 
 
 25
 The plurality's mode of analysis in Clements, set forth in Part III of the opinion, rejected " 'heightened' equal protection scrutiny." Id. at 2845 (Rehnquist, J.). The majority of the Court, however, clearly did not concur in the plurality's equal protection analysis. See id. at 2850 n.1 (Brennan, Jr., dissenting). Moreover, even the plurality acknowledged that the established precedents have applied strict scrutiny in "ballot access cases involving classification schemes that impose burdens on new or small political parties or independent candidates." Id. at 2844 (Rehnquist, J.) (citing Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 7 L.Ed.2d 24 (1968)). Rather than attempting to repudiate that line of cases, the plurality distinguished them as inapplicable because the restriction in Clements did not burden minority parties or independent candidates. Clements involved restrictions against certain officeholders in Texas running for other offices during their terms. Id. According to Justice Rehnquist, the challenged provisions "discriminate(d) neither on the basis of political affiliation nor on any factor not related to a candidate's qualifications to hold political office." Id. 102 S.Ct. at 2846 (emphasis added).
 
 
 26
 Unlike Clements, the instant case does involve ballot access restrictions burdening minority parties. We are therefore mandated by the Supreme Court cases to apply strict scrutiny. The state laws cannot stand unless they "further compelling state interests ... that cannot be served equally well in significantly less burdensome ways." American Party of Texas v. White, 415 U.S. 767, 780-81, 94 S.Ct. 1296, 1305-06, 39 L.Ed.2d 744 (1974). The district court in this case specifically found that means less restrictive than those embodied in the challenged statutes are available to Oklahoma to achieve its goal. However, the court concluded that established law does not require use of the least restrictive means. This legally erroneous statement is affirmed by the majority opinion, which would substitute "not unduly burdensome" or "not unnecessarily oppressive" for "least restrictive." In light of the recent Supreme Court opinions, I do not believe we are free to thus abandon strict scrutiny analysis and impose a less stringent standard.
 
 
 27
 I find it significant that the State did not need to change its voting laws to prevent frivolous or fraudulent candidates from gaining access to the ballot, to avoid voter confusion, or to prevent the burden of run-off elections. The record establishes that ballot overcrowding did not plague Oklahoma elections with these problems before the ballot access requirements were made more stringent. The American Independent Party in 1968 was the only party to gain recognition in the thirty years before the enactment of the new provisions. Numerous decisions have considered such state experience relevant in ballot access cases. E.g., American Party of Texas v. White, 415 U.S. at 779, 783-84, 94 S.Ct. at 1305, 1307-08 (restrictions upheld where satisfaction of requirements by two small parties indicated requirements were not onerous); Storer v. Brown, 415 U.S. at 742, 94 S.Ct. at 1285 (remand to determine regularity with which Independents had previously gained access to ballot); Jenness v. Fortson, 403 U.S. at 439, 91 S.Ct. at 1974 (restrictions upheld where recent candidates for Governor and President had gained ballot designation by procedure complained of and won plurality of votes at general election); Williams v. Rhodes, 393 U.S. at 33, 89 S.Ct. at 11 (restrictions struck down where "the experience of many States ... demonstrates that no more than a handful of parties attempts to qualify for ballot positions even when a very low number of signatures, such as 1% of the electorate, is required."); McLain v. Meier, 637 F.2d at 1165 (restrictions struck down where "third parties have not qualified for ballot position in North Dakota with regularity, or even occasionally").
 
 
 28
 Because the record reflects that the prior Oklahoma laws constitute less restrictive means of satisfying Oklahoma's legitimate interest in protecting the integrity of its political processes, I would reverse.
 
 
 
 *
 The Governor of the State of Oklahoma, like the President of the United States, serves a four-year term. Candidates for the office of Governor of the State of Oklahoma and electors for the office of President of the United States run in alternative, even-numbered years
 
 
 [1]
 The requirements for ballot access by minority parties contrast with those for Independent candidates. An Independent candidate may get on the ballot by either filing a petition with signatures of five percent of the eligible voters or simply by paying a filing fee. Okla.Stat. tit. 26, § 5-112 (Supp.1975). This requirement must also be met by party candidates. Id. The Oklahoma Supreme Court has upheld the filing fee option as a means of ballot access for Independent candidates. Burns v. Slater, 559 P.2d 428 (Okl.1977) (no violation of equal protection vis-a-vis indigent candidates). An Independent who wishes to run for President must file a petition containing signatures of three percent of the total votes cast in the last presidential election. Okla.Stat. tit. 26, § 10-101.1 (Supp.1978). Cf. McClendon v. Slater, 554 P.2d 774 (Okl.1976) (candidates of American Party whose registration was changed to Independent when party lost recognized status not entitled to run as Independents because they were not truly "independent" but had allegiance to a party), cert. denied, 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977)
 
 
 [2]
 Because the election turnout in a presidential year is significantly greater than in a gubernatorial year, the retention requirement is much more stringent after a presidential election. This problem was avoided under the old law which permitted retention if a party received 10% of the votes cast in either of the two preceding general elections