Arlette **BAER**, et al., Plaintiffs,

v.

Natalie **MEYER**, Secretary of State for the State of Colorado; and The State of Colorado, Defendants.

Civ. A. No. 82–C–29.

United States District Court, D. Colorado.

Jan. 10, 1984.

Richard M. Borchers, Westminster, Colo., for plaintiffs.

Jill A. Gross, Asst. Atty. Gen., General Legal Services Section, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

This case involves an attack upon the constitutionality of Colorado's election laws and registration practices. Plaintiffs Arlette Baer, Bernard Raizen, Don Rickey, Jr., Paul Grant, Ruth Bennett, the Citizens Party of the State of Colorado (hereafter "Citizens Party"), and the Libertarian Party of Colorado (hereafter "Libertarian Party") sued for a declaratory judgment and a permanent injunction. They assert rights protected under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. The original defendants were Mary Estill Buchanan, formerly Secretary of State of Colorado, and the State of Colorado.[1] Defendant Buchanan was sued only in her official capacity. In January, 1983, Buchanan was succeeded in office by Natalie Meyer, and Ms. Meyer has been substituted as a defendant.

Plaintiffs claim that ballot access restrictions in the Colorado Election Code of 1980, C.R.S. § 1–1–101, *et seq.*, (hereafter "Colorado Election Code" or "Code") and Colorado's voter registration procedures infringe upon their rights to vote and to political association, thus violating First and Fourteenth Amendment rights. This memorandum opinion constitutes my findings of fact and conclusions of law as required by Fed.

---

1. Plaintiffs have named the State of Colorado as a party defendant. The defendants have not asserted Eleventh Amendment immunity on the state's behalf. The jurisdictional nature of the Eleventh Amendment, however, may require me to take notice of its potential application *sua sponte. See Bertot v. School District No. 1,* 522 F.2d 1171, 1185 (10th Cir.1975). It is fundamental that the immunity provided the states by the Eleventh Amendment may be waived. Since the State of Colorado has appeared and defended this action as a named party, and

since neither its pleadings, motions or other submissions contain any express or implied invocation of immunity, except as to costs, I find and conclude that the State of Colorado has waived its Eleventh Amendment immunity from suit in this court for purposes of this action only. Furthermore, the State of Colorado's assertion that it is immune from any award of costs appears to be incorrect. *Hutto v. Finney,* 437 U.S. 678, 695–96, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522 (1978). Thus costs may be awarded against the state if appropriate.

R.Civ.P. 52(a) and 65(d). Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343(3).

## I. *General Background and Issues Presented.*

Plaintiffs Baer, Raizen and Rickey are members of the plaintiff Citizens Party. Formed in 1980 as an unincorporated association, the Citizens Party supports the national Citizens Party's programs and policies. It supported Barry Commoner's presidential candidacy in 1980. The Citizens Party also supported congressional candidates, including Robert McFarland, M.D., who ran for Congress in Colorado's Second Congressional District.

Plaintiffs Grant and Bennett are members of the plaintiff Libertarian Party. Founded in Westminster, Colorado, the Libertarian Party achieved Colorado ballot designation for presidential electors in 1976 and 1980. In 1982, the plaintiff Grant ran as the Libertarian candidate for Governor of Colorado receiving over two percent of the total votes cast for that office. Plaintiff Bennett is the Libertarian Party's state chairperson, and has sought election to the Colorado House of Representatives.

The plaintiffs attack the Colorado Election Code provision defining "political parties," contending that it creates an impermissibly oppressive burden on minority parties attempting to establish their viability as political forces within the political party election system. They argue that meeting the statutory definition of "political party" is crucial to attaining political effectiveness, since only recognized "political parties" can take advantage of Code provisions granting parties ballot access without the burden of circulating a petition for each and every candidate supported by the party. Plaintiffs contend that the provisions under which they must operate effectively preclude their obtaining the support necessary to gain recognition as a "political party" under the Code. Further, they contend that the voter registration procedures adopted by the defendant Secretary of State put minor parties at a significant political disadvantage, not only in competing with the Democratic and Republican

parties for votes, but also in attempting to satisfy the Code's threshold requirements for recognition as "political parties."

Thus the plaintiffs attack not only the election statutes, but also the practices followed pursuant to those statutes. Their complaint is that their rights have been violated by the aggregate effects of the targeted Code provisions *and* the procedures followed in applying and enforcing those provisions. The arguments addressed to various particular provisions of the Code, and to various election procedures, necessarily are interdependent.

Defendants admit that the statutory provisions and election practices challenged by the plaintiffs restrict the efforts of minor parties to place their candidates on the ballot and to function as political parties in Colorado. Defendants contend, however, that the restrictions are necessary to protect state interests in efficient and serious elections. Such state interests, of course, have been recognized by the United States Supreme Court. Thus the defendants deny the plaintiffs' claims of unconstitutionality.

## II. *Specific Findings and Conclusions.*

 In cases challenging state election laws affecting minority party rights to ballot access, the Supreme Court has held that a state must establish that its election law classifications are necessary to serve a compelling state interest. *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979); *American Party of Texas v. White*, 415 U.S. 767, 780, 94 S.Ct. 1296, 1305, 39 L.Ed.2d 744 (1974); *Williams v. Rhodes*, 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). As the Supreme Court stated in *Williams v. Rhodes*,

"In the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of

association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States. Similarly we have said with reference to the right to vote: 'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.' " 393 U.S. 23, 30–31, 89 S.Ct. 5, 10 (footnotes omitted).

Moreover, because of the primacy of the rights burdened, the state may not adopt a particular measure if significantly less burdensome alternatives would achieve its legitimate ends. *See Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. at 185, 99 S.Ct. at 990–991; *American Party of Texas v. White,* 415 U.S. at 781, 94 S.Ct. at 1306.

 On the other hand, a state's interest in protecting its electoral process has been recognized as substantial. *See Clements v. Fashing,* 457 U.S. 957, 965, 102 S.Ct. 2836, 2844–2845, 73 L.Ed.2d 508 (1982); *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). Because of this recognition, the cases have focused on whether there exist less burdensome alternatives than the measures adopted by the state. Where such alternatives exist, the challenged election laws should be deemed to be unnecessarily oppressive, and the courts have a duty to declare them unconstitutional. *Arutunoff v. Oklahoma State Election Board,* 687 F.2d 1375, 1379 (10th Cir.1982). Of course, this sort of analysis necessarily is comparative. Each case "must be resolved on its own facts after due consideration is given to the practical effect of the election laws of a given state, viewed in their totality." *Id.*

Defendants argue that the standard of review just stated has been modified by *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), to give greater deference to the state's interest in regulating its elections. Defendants misapprehend the Supreme Court's discussion of the standard of review in *Clements.* Justice Rehnquist's opinion for the court represented only a plurality of the justices in part III, which discussed the appropriate standard of review. Further, part III itself distinguished *Clements* from the Supreme Court's earlier cases on ballot access and voting rights. *Clements* concerned a state's attempt to restrict office-seeking by persons already holding state office. Understandably, both the officeseekers' and the state's interests presented in *Clements* were found to differ from the balance already struck in the existing line of ballot access and voting rights cases.

Finally, the defendants' argument fails to take into account the constitutional difficulty presented in all cases where minority rights are impaired by legislative action. As intimated in *United States v. Carolene Products Co.,* 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938), one of the primary justifications for heightened scrutiny of such legislation is the concern that legislative bodies, being creatures of the majority, may not be as responsive to minority rights as the Constitution demands. This practical consideration was recognized in Circuit Judge McWilliams' majority opinion in *Arutunoff v. Oklahoma State Election Board,* 687 F.2d 1375, 1378 (10th Cir.1982), where he wrote:

"A state's election laws, however, cannot operate so as to freeze the political status quo. They must recognize the fact that there is a constant fluidity in the fortunes of political parties, particularly minor political parties. Thus, the courts have invalidated state ballot access laws that are oppressive and make it virtually impossible for any but the two major parties to achieve ballot positions for their candidates." (citations omitted).

To put it another way, minority interests cannot seek legislative remedies with the same likelihood of success as majority interests. In no situation is this more true

than in enacting or amending election laws, for it is by these laws that those in power control the electoral process and may be able to insulate their incumbencies against threats from newer political movements.

For these reasons, I must reject the defendants' arguments concerning the effect of *Clements* on the standard of review applicable to this case. My duty is to apply the law as enunciated by the Supreme Court in the line of cases beginning with *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). As stated above, this is the strict judicial scrutiny standard to be applied when state laws burden rights as fundamental as the right to vote and the right to political association. *See Arutunoff, supra,* at 1381 (dissent of Circuit Judge Seymour).

### A. *Colorado Election Code Definition of "Political Party".*

■ As noted above, the plaintiffs' challenge attacks the definition of a "political party" under the Colorado Election Code. According to that definition:

> " 'Political party' means any political organization which at the last preceding gubernatorial election was represented on the official ballot either by regular party candidates or by individual nominees only if it cast for its gubernatorial candidate at least ten percent of the total gubernatorial vote cast in the state at such election." C.R.S. § 1–1–104(18), (as amended 1980).

Thus status as a political party in Colorado depends entirely upon the performance of a party's candidate in a race for one statewide office that occurs once every four years. "Political parties" as defined in the Code are permitted to conduct state-sanctioned delegate selection caucuses, petition drives, and primary elections pursuant to C.R.S. § 1–4–601, *et seq.*, (as amended 1980), for the purpose of placing their candidates' names on the general election ballot. Further, only "major political parties," which as a practical matter means the Democratic and Republican parties, may provide election judges or poll watchers to guard the integrity of the election process. *See* C.R.S. § 1–1–104(15), and § 1–5–101, *et seq.*

Political movements or factions which aspire to function as parties but do not meet the Code's definition of "political parties" are classed as "political organizations" in C.R.S. § 1–1–104(17). No benefits whatever inure to "political organizations." Section 1–1–104(17) is little more than statutory recognition that candidates supported by parties not qualified as Colorado Election Code-approved "political parties" can reach the general election ballot only by petition. Consequently, under the Colorado Election Code, political parties that behave as such by having members, holding conventions, and selecting nominees for statewide and local offices must do so outside the pattern of benefits conferred on "political parties" by the Colorado Election Code, unless these parties first satisfy the quadrennial gubernatorial election performance requirements of C.R.S. § 1–1–104(18).

Colorado has not entirely eliminated ballot access for minority political candidates. As noted above, a process of petitioning is provided for candidates not affiliated with recognized "political parties." *See* C.R.S. § 1–4–801, *et seq.*, (as amended 1980). However, since only "political parties'" names are protected in petition drives pursuant to § 1–4–801, the result can be a confusing free-for-all in which more than one candidate may be listed on the general election ballot as representing the same "party" for the same office. Plaintiffs produced evidence at trial that this sort of confusion occurred with regard to Libertarian Party candidates in a recent election for Boulder County Commissioner. The resulting dilution, through ballot confusion, of a minority party's showing at the polls could constitute a serious obstacle to achieving the status of a protected political party, for it makes possible the splitting of minority party support among several gubernatorial candidates all claiming to be that party's candidate, thus rendering impossible the attainment of the ten per-

cent threshold to qualify under C.R.S. § 1–1–104(18).

## B. *Voter Registration Procedures.*

Plaintiffs also have claimed that Colorado's voter registration procedures improperly discriminate against minority parties. The Colorado Election Code, on its face, does not discriminate among political parties with regard to party affiliation; it permits all voters to declare their party affiliation. Only if one does not declare a party affiliation does the Election Code require him or her to register as "unaffiliated." In practice, however, Colorado has established voter registration forms that provide checkoff boxes only for those who are "Democratic," "Republican," and "Unaffiliated." Voters who wish to declare affiliation with other parties can do so only in the portion of the form captioned "Remarks."

Evidence at trial indicated that voters, when they register, often are not told of their right to declare a party affiliation other than Democratic or Republican. In fact, the evidence tended to show that voters seeking to register as affiliated with parties other than these two parties frequently are informed that such affiliation is impossible under the election laws.

Even more disturbing, however, is the consequence of this registration practice: that minority party voters, before being allowed to register, are required to swear an oath that they are "unaffiliated" with any political party, even though in truth, and in their own minds, they are affiliated, albeit not with one of the two major parties. Requiring one who is in fact affiliated with the Libertarian Party or the Citizens Party, to swear, subject to the penalties of perjury, that he or she is "unaffiliated," as the price of registering to vote, is so likely to chill the exercise of fundamental First Amendment rights as to be intolerable in a free society. One should not be required to sacrifice his or her conscience, or risk being charged with perjury, in order to exercise a right guaranteed by the Constitution.

There is no evidence that voter registration procedures could not accommodate those who wish to indicate a preference for minority party affiliation just as they now accommodate Democrats, Republicans and those whose independent status allows them to swear truthfully that they are unaffiliated. Being an "independent" and being a member of a new or minority party are certainly not the same status, as is implied when both are lumped into the category "Unaffiliated." Indeed, today's major parties have not always been so, nor should the law assure them that status in perpetuity. Barriers to minority party registration buttress the political status quo in a manner that muffles the robust political discussion that the First Amendment was framed to protect. There was no two party system when that amendment was drafted. The ideal it sought was, and remains, a society open to the free and effective expression of diverse political views.

Nor are the questioned registration practices without substantial practical impact. Plaintiffs' evidence showed that these registration procedures create a significant disparity in political organizational capacity between the two traditional parties on the one hand and minority parties on the other. Computer printouts of voters' names, addresses and party affiliations can be obtained for a fee from the larger counties. The defendant Secretary of State's office, also for a fee, will provide raw computer data, which must be processed to be of value. A private company sells a list of voters, with their party affiliations, compiled from information provided by the Secretary of State. In whatever form and wherever obtained, however, these sources of voter information list only the three affiliations for which boxes are provided on the registration form: Democratic, Republican and Unaffiliated. Thus the Democratic and Republican parties are provided convenient lists of voters affiliated with their respective parties. Obviously these lists are invaluable in organizing campaigns, enlisting party workers and raising funds. Minority party workers must grub through the registration records of the nearly 500,000 so-

called "unaffiliated" voters hoping to find some who found a way to register a preference for their party.

Political organizing and fund raising thus have been immensely simplified and partially financed for the two major parties, courtesy of the registration and recording practices in issue. While minority parties laboriously mine voter registration forms seeking an occasional nugget of information in the "remarks" section to show a minority party preference, the two major parties have such information provided wholesale. Plaintiffs' evidence showed convincingly that diverting campaign workers in sufficient numbers to glean such information from voter registration forms, or to seek it by directly contacting "unaffiliated" voters, would so heavily drain campaign resources that these alternate methods of gathering the same information are neither fruitful nor practicable.

Regarding fund raising, and similar efforts directed to subsequent elections, the evidence showed that voter affiliation lists are the only available information sources which identify individuals with their voting patterns. Obviously, such identification is not absolute: ballots are secret, and voters are free to vote in general elections for candidates other than those endorsed by their party. It cannot be denied, however, that compilations of voter affiliation information provide those who have them a substantial head start for political organization and campaign finance. As a direct consequence of Colorado's election registration practices, this substantial competitive advantage is provided only to the two major parties. The defendants have produced no persuasive evidence that the same information could not be provided to minority parties as well, nor that any additional work or expense necessary to provide it would be substantial.

### C. *Burden on Minority Party Ballot Access and Right to Vote.*

In ruling on the plaintiffs' equal protection claims, I must first determine whether the Code's regulatory scheme substantially burdens the plaintiffs' ballot access and voting rights in a manner not also affecting the two qualified political parties. Based on the evidence and the plain language of the Colorado Election Code, I find and conclude that a substantial and disproportionate burden has been placed on the plaintiffs' ballot access and voting rights. The Code, while purporting to tolerate the existence of minor political parties, effectively disarms them from participating meaningfully in the real life electoral process by thwarting at the threshold their efforts to obtain the information indispensable to organize politically effective campaigns on behalf of their candidates.

By express Code provisions Colorado has narrowly limited the privileged status of "political party" to those parties which have demonstrated substantial past success in one political race that can occur only once every four years: the statewide gubernatorial contest. Thus the opportunity to qualify can occur only once every four years. No allowance is made for a party which may spring up in response to some major event or movement that may occur just after a gubernatorial election year.

Moreover, no allowance is made for minority parties not interested in statewide offices, but seeking to field candidates only on a local or congressional district basis. Ironically, a third party whose candidate had just been elected President of the United States would not qualify as a protected "political party" under Colorado law, and such a party would still be at a disadvantage in competing with the Republicans and Democrats in the next general election.

Unlike the parties affected by the Oklahoma laws upheld by the Tenth Circuit's split decision in *Arutunoff*, a Colorado political party may not share in the benefits provided by the Colorado Election Code without first having demonstrated significant political strength in the last prior gubernatorial election. In Oklahoma, a new or minor party may gain protected status as a recognized party by a petition drive gathering signatures equal to five percent of the votes cast in the preceding general

election for *either* President or Governor. That alternative pathway to qualification clearly distinguishes this case from that reviewed by the Tenth Circuit in *Arutunoff.* Not only is there an additional method of qualifying in Oklahoma, the opportunity is a continuing one and is more liberal because either of two prior statewide elections may be used as the measure. Moreover some persons may be willing to sign a petition to allow a new party to compete even though they would not actually vote for that party, or vote at all, in the election. Finally, the Oklahoma five percent signature requirement for qualification by petition is obviously more liberal than Colorado's requirement of a ten percent actual vote at the last gubernatorial election.

Defendants argue that ballot access by petition provides non-sanctioned parties sufficient ballot access to avoid a finding of unconstitutionality. As discussed above, however, the access provided by the petition process leaves minority political parties vulnerable to confusion and siphoning of votes by spurious candidates who adopt ballot designations the same as or similar to a minority party's designation. As stated, such confusion actually has occurred.

Defendants argue that the State of Colorado should not be required to protect minority parties from confusion of this sort. This argument might be convincing if Colorado had adopted a position of neutrality with regard to petition ballot access and party designation. But the election code affirmatively protects the two presently qualified "political parties" and their ballot designations in C.R.S. § 1–4–801(1)(a). The net effect of this protection for qualified party labels, when combined with the requirement that non-qualified parties either petition individual candidates onto the general election ballot or garner ten percent of the gubernatorial vote every four years, is to erect a practically insurmountable barrier to achieving the officially privileged status of a recognized "political party."

Additional burdens which further impair minor party rights are imposed by Colorado's registration practices and procedures. By using registration forms that refer only to the Democratic and Republican parties, and by compiling and providing computerized voter data showing only affiliations with those parties, Colorado provides the two major parties valuable political advantages which are denied to other parties.

Plaintiffs presented credible evidence regarding the actual burden these practices place on their efforts to offer alternative political choices. They also presented evidence, not convincingly countered by the defendants, that the additional expense to reform the existing registration process so as to treat all parties equally would be relatively small. Thus alternatives substantially less burdensome to the plaintiffs' constitutional rights are readily available. Further, these alternatives would not detract from the state's legitimate interest in protecting its electoral process.

Defendants presented no convincing evidence that the questioned registration practices, or the Code provisions in issue, bear any relationship to the state's interest in protecting its electoral process from diversionary efforts by insignificant political splinter groups. Nor was there any substantial evidence that they are needed to protect against selection of officeholders not generally acceptable to the voters as representative of their collective political will. In sum, no evidence was presented from which I could infer that the existing Colorado laws and practices are necessary to protect a compelling state interest, or that no less burdensome alternatives would serve equally well to protect any such interest.

### III. *Conclusion.*

For the reasons discussed, I conclude that the Colorado Election Code employs classifications that impermissibly burden the plaintiffs' exercise of their rights to ballot access and to cast their votes effectively. Viewed in their totality, the Colorado election laws and practices challenged by the plaintiffs affirmatively favor the Democratic and Republican parties while denying other parties the organizational

tools and recognition needed to compete effectively for votes.

My references to the Oklahoma electoral scheme which barely passed muster in *Arutunoff* should not be interpreted as implying that Colorado should mirror Oklahoma's election laws in revising its own. It is the function and duty of the Colorado General Assembly to provide an electoral system that does not oppress the political rights of minor parties or their adherents. There is no reason this cannot be accomplished while preserving Colorado's interest in serious and efficient elections.

In attempting to remedy the deficiencies in the existing election laws and practices, the defendants might be well advised to consider the as yet unrealized import of footnote 9 to the Supreme Court's opinion in the leading case of *Williams v. Rhodes,* 393 U.S. 23, 33, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968). There, the Supreme Court observed that the vast majority of states do not require minority parties to demonstrate more than one percent support before granting ballot recognition, and, in most cases, this showing may be by petition.

The evidence here presented portrayed Colorado as one of the four most restrictive states in this nation not only because of the high percentage of actual voter support required, ten percent, but also because even that relatively high standard can be met only in one statewide race which occurs only once every four years.

None of the cases cited by the parties revealed a challenge to the percentage-of-electorate requirements that approached the kind of sophisticated proof that has become standard in legislative reapportionment cases. By these comments, I am observing only that resourceful plaintiffs challenging state election laws will not necessarily cease such challenges because the laws employ a certain percentage that was not disapproved in a particular case. Colorado's overriding interest should be to develop a new set of ballot access provisions that truly will permit alternative voices to be heard, while preserving the integrity of the election process. That would satisfy the spirit as well as the letter of the First Amendment. As the Supreme Court stated nearly thirty years ago:

> "All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society." *Sweezy v. New Hampshire,* 354 U.S. 234, 250–51, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957).

As prevailing parties, the plaintiffs are entitled to their costs. Pursuant to 42 U.S.C. § 1988, the plaintiffs also are entitled to reasonable attorneys' fees against the defendant Secretary of State. Counsel for plaintiffs and defendants shall meet within ten days from the date of this order in an attempt to agree on a reasonable amount for such fees. If no agreement can be reached, the plaintiffs may file an appropriate motion for attorneys' fees, and that motion will be heard on an expedited basis.

Accordingly,

IT IS ORDERED that the defendants State of Colorado and the Secretary of State of Colorado are hereby permanently enjoined from enforcing the provisions of the Colorado Election Code against the plaintiffs Arlette Baer, Bernard Raizen, Don Rickey, Jr., Paul Grant, Ruth Bennett, the Citizens Party of the State of Colorado and the Libertarian Party of the State of Colorado, to the extent that those provisions require the plaintiffs to comply with C.R.S. § 1–1–104(18) before qualifying for the benefits of "political party" status within the meaning of that Code.

It is further ORDERED that the defendants are permanently enjoined from promulgating, accepting, and otherwise using voter registration forms that do not treat

*de facto* political parties equally without regard to the definitions contained in C.R.S. § 1–1–104 (as amended 1980).

It is further ORDERED that the defendants shall pay the costs of this action and the defendant Secretary of State shall pay the plaintiffs' reasonable attorneys' fees.