741 F.2d 981
 The LIBERTARIAN PARTY OF INDIANA, Individually and on Behalf
of its Members, Affiliates, and Sympathizers, and Janet
Lawson and Sherry Lynn Evans, Individually and on Behalf of
All Other Persons Similarly Situated, Plaintiffs-Appellants,
v.
Michael M. PACKARD, in His Official Capacity as Indiana
Commissioner of Motor Vehicles, the Indiana Bureau of Motor
Vehicles, Julian L. Ridlen in His Official Capacity as
Treasurer of the State of Indiana, Otis E. Cox in His
Official Capacity as Auditor of the State of Indiana, the
Indiana Democrat State Central Committee, and the Indiana
Republican State Central Committee, Defendants-Appellees.
 No. 83-3023.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 9, 1984.
Decided Aug. 15, 1984.
 
 Ralph Ogden, Denver, Colo., for plaintiffs-appellants.
 Daniel F. Evans, Jr., Bayh, Tabbert & Capehart, Gregory F. Hahn, Dillon, Hardamon & Cohen, Indianapolis, Ind., for defendants-appellees.
 Before ESCHBACH and FLAUM, Circuit Judges, and JAMESON, Senior District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 This appeal involves a constitutional challenge to a state statutory scheme under which the State of Indiana raises revenue through the sale of personalized license plates and distributes a portion of that revenue to qualifying political parties. The plaintiffs claim that the Indiana scheme violates their rights under the first and fourteenth amendments, and they sought a preliminary injunction to restrain its implementation. The district court denied the motion for a preliminary injunction and the plaintiffs appealed. We affirm.
 
 I. BACKGROUND
 
 2
 In 1977, the Indiana General Assembly enacted the Personalized License Plate Act (codified at Ind.Code Secs. 9-7-5.5-1 to 9-7-5.5-11 (1982)). This law authorizes the registered owner or lessee of a motor vehicle to apply to the Bureau of Motor Vehicles for a personalized license plate. A personalized license plate contains a combination of letters or numerals chosen by the owner or lessee of the vehicle rather than a state-imposed letter-numeral combination. In addition to the standard excise tax and registration fees assessed for the purchase of a license plate, a purchaser of a personalized license plate must pay a special fee totaling $40.
 
 
 3
 Sections 7 and 8 of the Personalized License Plate Act prescribe that upon receipt of the $40 fee, $7.00 shall be deposited in the state's Motor Vehicle Highway Account, $3 shall be distributed to the local license branches, and the remaining $30 shall be deposited with the state treasurer in a special fund for distribution to qualifying political parties. According to the Act, the monies from the special fund are distributed to "any political party that cast at least five percent (5%) but less than thirty-three percent (33%) of the total vote of the state of all political parties at the last preceding general election for the office of governor ... [in an amount] equal to the fractional amount of the vote cast ...." The balance of this special fund remaining after such distribution is distributed in equal amounts to the two political parties that cast the largest and next largest number of votes at the most recent election for governor.
 
 
 4
 On October 13, 1983, plaintiffs Janet Lawson and Sherry Lynn Evans purchased personalized license plates from the Indiana Bureau of Motor Vehicles, paying the $30 political contribution "not willingly and voluntarily, but because it was the only means whereby [they] could obtain a personalized license plate." Appellees' Brief at 7. Shortly thereafter, the plaintiffs brought suit against the Indiana Bureau of Motor Vehicles and various Indiana officials in federal district court.[1] The individual plaintiffs and the Libertarian Party, on behalf of its members, alleged that the Indiana scheme violated their rights under the first and fourteenth amendments by conditioning the availability of a government benefit on the surrender of their first amendment rights of free association and free expression. The Libertarian Party also made an equal protection argument, complaining that the Indiana scheme unconstitutionally discriminated in favor of the Democratic and Republican parties, the only two parties that ever have qualified for state funding, at the expense of minor parties such as the Libertarians.[2] In their original complaint the plaintiffs sought to have sections 7 and 8 of the Personalized License Plate Act declared unconstitutional, to have the implementation of sections 7 and 8 enjoined, and to have state officials return money that had been collected pursuant to those sections. They also sought to have the case certified as a class action, with the class consisting of "all other persons who have been or will be forced to make political 'contributions' to the Democratic and Republican parties as a condition precedent to their obtaining personalized license plates." After the defendants successfully moved to join the Indiana Republican State Central Committee and the Indiana Democrat State Central Committee as indispensable parties, the plaintiffs amended their complaint to include a claim for damages against these two new defendants.
 
 
 5
 On November 11, 1983, the district court held a hearing on the plaintiffs' motion for a preliminary injunction to prevent the disbursement to the Democrats and Republicans of money that had been collected through the sale of personalized license plates. After hearing evidence and the parties' arguments, the district court issued a ruling denying the plaintiffs' motion for a preliminary injunction. This appeal followed.
 
 II. THE DECISION BELOW
 
 6
 It is well established that in deciding whether to issue a preliminary injunction, a district court should consider four factors: (1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; (3) whether the plaintiff has a reasonable likelihood of success on the merits; and (4) whether the issuance of the injunction will serve the public interest. Martin v. Helstad, 699 F.2d 387, 389 (7th Cir.1983). The decision is one within the discretion of the district court and should be reversed only if the district court is found to have abused its discretion or has applied an improper legal standard. Charles v. Carey, 627 F.2d 772, 776 (7th Cir.1980).
 
 
 7
 The court below acknowledged the four factors that should be considered in deciding whether to issue a preliminary injunction. However, it based its ruling only on consideration of the first two factors. The court stated:
 
 
 8
 There was ample evidence presented at the November 11, 1983 hearing that the Republican and Democratic Parties of the State of Indiana would be greatly harmed by the granting of a preliminary injunction in this case. Activities would have to be curtailed and employees laid off. Denial of plaintiffs' motion, on the other hand, represents a maximum harm to the three plaintiffs of $90.00, their total "contribution" under Ind.Code 9-7-5.5-7. Furthermore, the individual plaintiffs admittedly bought their plates for the sole purpose of enabling themselves to bring this action, and thus invited whatever miniscule harm they may sustain while waiting for this case to be tried on the merits.
 
 
 9
 Plaintiffs did not offer to post an injunction bond equal to the harm to defendants that would be caused by issuance of a preliminary injunction. The balance of harms that the Court must consider therefore requires denial of plaintiffs' motion.
 
 
 10
 If plaintiffs succeed on the merits, and thus recover their $90.00, it is obvious that they had an adequate remedy at law, and that their harm was not irreparable. If they lose on the merits, they were not entitled to preliminary injunctive relief in the first place.
 
 
 11
 Memorandum of Decision, No. IP83-1656-C at 3 (S.D.Ind. Nov. 21, 1983).
 
 
 12
 The plaintiffs argue that the district court erred in its ruling because it failed to recognize that the plaintiffs were alleging more than monetary injury. According to the plaintiffs, the court should have considered the merits of the case, since their claim of serious and irreparable harm was based largely upon their allegation that the implementation of sections 7 and 8 of the Personalized License Plate Act constituted an ongoing first amendment violation. The defendants concede that the district court should have considered the merits of the plaintiffs' constitutional claims, but, of course, contend that the plaintiffs' claims are not meritorious.
 
 
 13
 We agree with the parties that the district court should have considered the merits of the plaintiffs' claims. As many courts have recognized, the merits of a dispute often are intertwined with the other three factors to be considered in the decision to issue or deny a preliminary injunction. An assessment of the merits
 
 
 14
 suffuses the other factors requisite to a preliminary injunction.... The accommodation and "balancing" of these considerations often, perhaps typically, depend on underlying premises as to the substantive law defining legal rights.
 
 
 15
 Thus in cases involving a claim by movant of interference with protected freedoms or other constitutional rights, the finding of irreparable injury ... depends on an appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment.
 
 
 16
 Delaware & Hudson Railway v. United Transportation Union, 450 F.2d 603, 619-20 (D.C.Cir.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). Cf. Reindeer Brothers, Inc. v. Rain Bird Eastern Sales Corp., 627 F.2d 44, 49 (7th Cir.1980) ("likelihood of success on the merits often serves as a threshold requirement for entitlement to preliminary relief"). In this case, the plaintiffs claimed, allegedly on behalf of a large class of people, that the continued use of their money to support the Democratic and Republican parties in Indiana violated their first amendment rights. This was the sort of allegation that, if found meritorious, could support a preliminary injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (plurality opinion). Accord Abood v. Detroit Board of Education, 431 U.S. 209, 244, 97 S.Ct. 1782, 1804, 52 L.Ed.2d 261 (1977) (Stevens, J., concurring); Citizens for a Better Environment v. City of Park Ridge, 567 F.2d 689, 691 (7th Cir.1975). Cf. Ellis v. Brotherhood of Railway, Airline and Steamship Clerks, --- U.S. ----, 104 S.Ct. 1883, 1889-90, 80 L.Ed.2d 428 (1984) (under Railway Labor Act, "union cannot be allowed to commit dissenters' funds to improper uses even temporarily"). "The timeliness of political speech is particularly important." Elrod v. Burns, 427 U.S. at 374 n. 29, 96 S.Ct. at 2690 n. 29. Since this is an election year, any governmental subsidization of political parties in violation of the first amendment would be especially offensive, and the timeliness of relief would be critical. Thus, proper assessment of the plaintiffs' right to a preliminary injunction necessitated consideration of the merits of the plaintiffs' claims.
 
 
 17
 Although we have found that the district court improperly analyzed the plaintiffs' motion for a preliminary injunction, it does not follow that we must reverse its ruling. It is well settled that a reviewing court may affirm the decision of a court below if that decision is correct, even though the court below relied upon a wrong ground or gave a wrong reason. Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937); Panter v. Marshall Field & Co., 646 F.2d 271, 281 (7th Cir.1981). In this case, since the plaintiffs' claims largely involve questions of law, and since both parties have argued the merits of these claims on this appeal, we are in a good position to determine whether the district court's refusal to grant the plaintiffs a preliminary injunction can be justified by a low probability of their success on the merits. We therefore deem it appropriate for us to consider the merits of the plaintiffs' constitutional claims.
 
 III. THE MERITS
 
 18
 We will divide our discussion of the merits into three parts. First, we will review briefly two major Supreme Court cases dealing with public financing of political parties, American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), and Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Next, we will address the plaintiffs' argument that the Indiana scheme violates their first amendment rights by conditioning the availability of a government benefit, personalized license plates, on the support of political beliefs to which the plaintiffs do not subscribe. Finally, we will address the plaintiffs' other constitutional argument, that the Indiana scheme violates the first amendment and the equal protection clause because it invidiously discriminates against minor political parties.
 
 A. American Party and Buckley
 
 19
 We deem it appropriate to review the American Party and Buckley cases because they clearly establish that government may use public funds to finance qualifying political parties, that is, some parties but not others, and because acceptance of this proposition is a predicate to a proper evaluation of the plaintiffs' claims. In American Party, the Supreme Court found constitutional a Texas statute that authorized the use of state revenue to help finance the primary elections of those political parties casting 200,000 or more votes for governor in the preceding general election. The law precluded any payment of state funds to minor political parties to help them defray the costs incurred in conducting their nominating and ballot qualification processes. The Court did not discuss the constitutionality of using public funds to finance private political parties, implicitly upholding this practice. It did reject explicitly, however, the plaintiffs' contention that the Texas law discriminated against minor parties. The Court stated:
 
 
 20
 We are unconvinced, at least based upon the facts presently available, that this financing law is an "exclusionary mechanism" which "tends to deny some voters the opportunity to vote for a candidate of their choosing" or that it has "a real and appreciable impact on the exercise of the franchise."
 
 
 21
 415 U.S. at 794, 94 S.Ct. at 1312 (citations omitted). Thus, although the funds at issue in American Party were used only to finance primary elections, the case nonetheless supports the proposition that public funds may be used to subsidize the activities of some political parties but not others.
 
 
 22
 This proposition was more fully explored and ultimately reaffirmed in the Buckley case. Buckley involved the constitutionality of various facets of the Federal Election Campaign Act of 1971 (FECA), as amended in 1974. Subtitle H of FECA established the Presidential Check-Off Fund, by which taxpayers could designate one or two of their tax dollars to be paid into a presidential election fund. From this fund major political parties--defined as those parties that had obtained more than twenty-five percent of the vote in the preceding presidential election--qualified for reimbursement for up to $2,000,000 for their nominating campaigns, and for subsidies of up to $20,000,000 for their candidate's presidential campaign. Minor parties--those that had received between five percent and twenty-five percent of the vote in the preceding presidential election--qualified for convention subsidies and campaign reimbursements proportional to their share of the vote in the preceding election, with the possibility of additional post-election reimbursements if they increased their share of the votes cast over the preceding election. Other political parties and/or candidates were made ineligible for pre-election subsidies and qualified for post-election reimbursements only if they secured five percent or more of the vote cast in that presidential election.
 
 
 23
 In upholding the constitutionality of Subtitle H, the Supreme Court stressed that public financing of political parties served important governmental interests. The court stated:
 
 
 24
 Subtitle H is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people. Thus, Subtitle H furthers, not abridges, pertinent First Amendment values.
 
 
 25
 424 U.S. at 92-93, 96 S.Ct. at 670 (footnotes omitted). The Court also emphasized that important governmental interests were served by limiting public assistance to those candidates with significant public support. Specifically, the Court referred to "Congress' interest in not funding hopeless candidacies with large sums of public money," and "the important public interest against providing artificial incentives to 'splintered parties and unrestrained factionalism.' " Id. at 96, 96 S.Ct. at 671 (citations omitted). In addition, the Court stated that denying public financing to some parties' candidates but not others was not a severe restriction on access to the electoral process. Contrasting Subtitle H with restrictions on access to the ballot, the Court stated:
 
 
 26
 [T]he denial of public financing to some Presidential candidates is not restrictive of voters' rights and less restrictive of candidates'. Subtitle H does not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice; the inability, if any, of minor-party candidates to wage effective campaigns will derive not from lack of public funding but from their inability to raise private contributions. Any disadvantage suffered by operation of the eligibility formulae under Subtitle H is thus limited to the claimed denial of the enhancement of opportunity to communicate with the electorate that the formulae afford eligible candidates.
 
 
 27
 424 U.S. at 94-95, 96 S.Ct. at 670-671 (footnote omitted). Thus, the Court concluded that Subtitle H was constitutional.
 
 B. The first amendment claim
 
 28
 Conceding that American Party and Buckley allow the use of public funds to finance qualifying political parties,[3] the plaintiffs contend that this case is distinguishable because of the manner in which the public funds are collected.[4] They argue that by allowing persons to purchase personalized license plates only if they contribute to certain political parties, the Indiana law impermissibly infringes those persons' first amendment rights of free expression and association.
 
 
 29
 It is well established that a government may not condition the availability of a public benefit on the relinquishment of rights guaranteed by the first amendment. Elrod v. Burns, 427 U.S. 347, 357-60, 96 S.Ct. 2673, 2681-83, 49 L.Ed.2d 547 (1976); Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). See also Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). It also is clear that "contributing to an organization for the purpose of spreading a political message is protected by the First Amendment." Abood v. Detroit Board of Education, 431 U.S. 209, 234, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977). Similarly, the right not to contribute to the spreading of a political message is protected by the first amendment. Id. Thus, in Abood, a case on which the plaintiffs rely heavily, the Court held that a local school board and the union representing the school's teachers could not require a teacher to pay to the union fees that would be used to finance the advancement of ideological and political causes, at least where the teacher objected to advancing those causes and where the causes were unrelated to the union's duties as collective-bargaining representative.
 
 
 30
 The plaintiffs claim that the Indiana Personalized License Plate Act violates the "unconstitutional conditions" doctrine, id. at 227, 97 S.Ct. at 1795, in the same manner as did the fee requirements that were struck down in Abood. Both are examples, they say, of government conditioning the availability of a public benefit--public employment in Abood and personalized license plates in this case--on the surrender of the first amendment right not to contribute to the advancement of a political or ideological message. However, based on the principles established in Buckley and American Party, we find that the Indiana scheme does not condition the availability of a public benefit on the surrender of first amendment rights, because the scheme does not implicate any first amendment rights.
 
 
 31
 The "unconstitutional conditions" doctrine is premised on the notion that what a government cannot compel, it should not be able to coerce. "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' " Perry v. Sindermann, 408 U.S. at 597, 92 S.Ct. at 2697 (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). Accordingly, "[t]he denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly." Elrod v. Burns, 427 U.S. at 361, 96 S.Ct. at 2683. Thus, in Elrod, for example, the Court reasoned that since a city government could not compel a person to affiliate with a political party, it could not discharge or threaten to discharge city employees solely on the basis of their political affiliation or nonaffiliation. Similarly, the holding of Abood, that public employees cannot be required as a condition of employment to contribute to union political activities that they oppose, was premised on the more general principle that government cannot compel persons to support financially the dissemination of ideas that they oppose. Other examples of the application of the "unconstitutional conditions" doctrine to protect first amendment rights are plentiful. See, e.g., Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. at 2697 (1972) (right to criticize public officials); Keyishian v. Board of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 684-85, 17 L.Ed.2d 629 (1967) (right to membership in political organization); Sherbert v. Verner, 374 U.S. 398, 404-06, 83 S.Ct. 1790, 1794-95, 10 L.Ed.2d 965 (1963) (right of Seventh-day Adventist not to work on Saturday); Torasco v. Watkins, 367 U.S. 488, 495-96, 81 S.Ct. 1680, 1683-84, 6 L.Ed.2d 982 (1961) (right not to declare belief in existence of God).
 
 
 32
 This case differs from Abood and the other cases cited above in that, according to American Party and Buckley, here the government can command directly what it is "coercing" through the sale of personalized license plates. In American Party, the State of Texas was using state revenue to help finance qualifying political parties. This revenue had been raised at least in part through taxes, that is, payments compelled by the government. Thus, the taxpayers of Texas effectively were subsidizing the activities of political parties that they might have opposed, and yet the Court found no constitutional objection. In Buckley, although Congress was raising money through a voluntary check-off provision, the Court explicitly indicated that Congress could have chosen to finance qualifying political parties by using general revenues that had been raised through taxes. Responding to the argument that Congress constitutionally was required to permit taxpayers to designate particular candidates or parties as recipients of their money, the Court stated:
 
 
 33
 [T]he appropriation to the Fund in Sec. 9006 is like any other appropriation from the general revenue except that its amount is determined by reference to the aggregate of the one- and two- dollar authorization on taxpayers' income tax returns. This detail does not constitute the appropriation any less an appropriation by Congress. The fallacy of appellants' argument is therefore apparent; every appropriation made by Congress uses public money in a manner to which some taxpayers object.
 
 
 34
 Buckley v. Valeo, 424 U.S. at 91-92, 96 S.Ct. at 669 (footnotes omitted) (emphasis added). Thus, the Court rejected the idea that the use of taxpayers' money to finance qualifying political parties violates the first amendment.
 
 
 35
 As we interpret Buckley, the reason that government constitutionally may be allowed to use public funds to finance political parties is that the funds are not considered to be contributing to the spreading of a political message, but rather are advancing an important public interest, the facilitation of "public discussion and participation in the electoral process, goals vital to a self-governing people." Buckley v. Valeo, 424 U.S. at 92-93, 96 S.Ct. at 670 (footnote omitted). In contrast, the fees at issue in Abood were being used to support the particular partisan viewpoint of one private organization. This type of subsidization of political speech clearly is intolerable under the first amendment:
 
 
 36
 Probably no one would suggest that Congress could, without violating this Amendment, pass a law taxing workers, or any persons for that matter (even lawyers), to create a fund to be used in helping certain political parties or groups favored by the Government to elect their candidates or promote their controversial causes. Compelling a man by law to pay his money to elect candidates or advocate laws or doctrines he is against differs only in degree, if at all, from compelling him by law to speak for a candidate, a party, or a cause he is against. The very reason for the First Amendment is to make the people of this country free to think, speak, write and worship as they wish, not as the Government commands.
 
 
 37
 International Association of Machinists v. Street, 367 U.S. 740, 788, 81 S.Ct. 1784, 1809, 6 L.Ed.2d 1141 (1961) (Black, J., dissenting). This portion of Justice Black's opinion was cited in Buckley along with the proposition that Congress's appropriation of money to qualifying political parties "involves no compulsion upon individuals to finance the dissemination of ideas with which they disagree." Buckley v. Valeo, 424 U.S. at 91 n. 124, 96 S.Ct. at 669 n. 124. Thus, this part of the Buckley opinion further indicates that the use of the public's tax dollars to finance qualifying political parties does not implicate taxpayers' first amendment rights.
 
 
 38
 Given that public financing of qualifying political parties does not offend the first amendment, it should make no constitutional difference that the money for such financing is raised through what is in effect a sales tax on personalized license plates. The main difference between a general appropriation and the scheme at issue here is that here each member of the public can control the amount of money distributed to qualifying political parties through his or her decision to buy or refrain from buying a personalized license plate.[5] However, this element of control in and of itself clearly is insufficient to implicate the first amendment; the check-off system at issue in Buckley also allowed taxpayers to control the number of public dollars spent to finance qualifying political parties. Moreover, the fact that some Indiana motorists might forgo owning a personalized license plate in order to avoid contributing money to political parties with which they may not agree also is of no constitutional significance. According to Buckley, their money would be going "to facilitate and enlarge public discussion and participation in the electoral process," Buckley v. Valeo, 424 U.S. at 92-93, 96 S.Ct. at 670; that these motorists may have a different view does not create in them the type of first amendment rights afforded to dissenters in a case such as Abood. "[E]very appropriation ... uses public money in a manner to which some taxpayers object." Buckley v. Valeo, 424 U.S. at 92, 96 S.Ct. at 669. Thus, we conclude as a matter of law that Indiana's Personalized License Plate Act does not condition the availability of a government benefit on the surrender of first amendment rights.
 
 
 39
 It follows from this conclusion that the first part of the plaintiffs' complaint, the part advancing an "unconstitutional conditions" theory, does not state a cause of action. Although it generally is inappropriate to issue a final judgment on the merits when a case is only at the preliminary injunction stage, University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981), on an appeal from a grant or denial of a preliminary injunction a federal appeals court may order a complaint dismissed if it determines as a matter of law that the complaint states no cause of action. Deckert v. Independent Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 232, 85 L.Ed. 189 (1940); Pratte v. NLRB, 683 F.2d 1038, 1045 (7th Cir.1982); Lee v. Ply*gem Industries, 593 F.2d 1266, 1270 (D.C.Cir.1979). Such a disposition seems particularly appropriate here, since both parties have argued the merits and urged us to consider them. Accordingly, on the remand of this case, we order the district court to dismiss that portion of the plaintiffs' amended complaint alleging that the Indiana statutory scheme violates the constitution by conditioning the availability of personalized license plates on the surrender of first amendment rights. Since this is the only allegation made by the individual plaintiffs and the only allegation made on behalf of the proposed class, the individual plaintiffs should be dismissed from the case and the motion for class certification denied.
 
 C. The equal protection claim
 
 40
 In its amended complaint in the district court, the Libertarian Party alleged that Sections 7 and 8 of the Personalized License Plate Act effectively discriminates against nonmajor political parties in Indiana. Having stated that only the Democratic and Republican parties ever have received money raised pursuant to the Act, the complaint goes on to allege:
 
 
 41
 By only providing for payments to the Democrat and Republican Parties, the statute establishes a mandatory system of financial support for the two major political parties, to the total exclusion of the Libertarian Party. This enables the Democrats and Republicans to dominate Indiana politics and establishes the Democrat and Republican Parties as the officially approved political parties in the State of Indiana, thereby violating the First Amendment rights of the Libertarian Party and of its members.
 
 
 42
 Insofar as the Libertarian Party is complaining that the Indiana scheme is invalid on its face because it finances only parties that show significant public support, we may reject that argument as a matter of law. Indiana's interest in "not funding hopeless candidates with large sums of public money ... necessarily justifies the withholding of public assistance from candidates without significant public support." Buckley v. Valeo, 424 U.S. at 96, 96 S.Ct. at 671.
 
 
 43
 Buckley did leave open the possibility, however, that a scheme of public financing of political parties might have the practical effect of discriminating against nonmajor parties. After pointing out that it was deciding only the constitutionality of Subtitle H on its face, the Court stated:
 
 
 44
 [S]ince the public financing provisions have never been in operation, appellants are unable to offer factual proof that the scheme is discriminatory in its effect.
 
 
 45
 In rejecting appellants' arguments, we of course do not rule out the possibility of concluding in some future case, upon an appropriate factual demonstration, that the public financing system invidiously discriminates against nonmajor parties.
 
 
 46
 Buckley v. Valeo, 424 U.S. at 97 n. 131, 96 S.Ct. at 672 n. 131. Although the Court did not define "appropriate factual demonstration," it later suggested that the relevant test might be whether the public financing scheme "disadvantages nonmajor parties by operating to reduce their strength below that attained without any public financing." Id. at 99, 96 S.Ct. at 673.
 
 
 47
 Because the Libertarian Party has alleged that the Indiana scheme operates to exclude nonmajor parties from meaningful participation in Indiana's political process, we cannot say as a matter of law that this portion of its complaint states no cause of action. This case is only at the preliminary injunction stage, and the Libertarian Party has a right to attempt to make a factual showing, at a trial on the merits, that it is being discriminated against in violation of the Constitution.[6] However, we do not find on the record before us that the Libertarian Party has made a factual showing of discrimination sufficient to support a preliminary injunction, and therefore we hold that its motion for a preliminary injunction properly was denied.
 
 
 48
 At the preliminary injunction hearing, the plaintiffs seemed to focus on their "unconstitutional conditions" theory, and thus they introduced only one type of evidence even arguably relevant to the equal protection claim. This evidence showed that money raised through the sale of personalized license plates constitutes a significant portion of the budgets of both the Democratic and Republican parties in Indiana. Though this showing may help support a discrimination claim, in and of itself it plainly is insufficient to establish a likelihood that the Libertarian Party would prevail on the merits of its discrimination claim.
 
 
 49
 The denial of the plaintiffs' motion for a preliminary injunction is affirmed, and the case is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable William J. Jameson, Senior District Judge for the District of Montana, is sitting by designation
 
 
 [1]
 A third individual also filed suit along with Lawson and Evans but has since withdrawn from this litigation
 
 
 [2]
 Although the Libertarian Party has couched its argument in terms of the first amendment, rather than the fourteenth amendment's equal protection clause, its complaint clearly lends itself to both first amendment and equal protection analysis. In a case such as this, where a party complains of unequal government subsidization of first amendment activity, there is considerable interplay between first amendment and equal protection principles. See Perry Local Educators' Ass'n v. Hohlt, 652 F.2d 1286, 1296 (7th Cir.1981). See generally Emerson, The Affirmative Side of the First Amendment, 15 Ga.L.Rev. 795, 802-03 (1981) (discussing "an equal protection element in the first amendment guarantee" in the context of governmental promotion of speech). In this case, we have chosen to characterize the Libertarian Party's claim of discrimination as an equal protection argument to distinguish it from the plaintiffs' other claim, which could arise only under the first amendment as applied to the states through the fourteenth amendment
 
 
 [3]
 Of course, the criteria used to determine whether a party qualifies for public financing must pass constitutional muster. In this case that is not an issue, since a similar 5% threshold requirement based on past election returns was upheld in Buckley v. Valeo, 424 U.S. at 99-100, 103-04, 96 S.Ct. at 673, 675
 
 
 [4]
 The plaintiffs also argue that American Party and Buckley are distinguishable because in those cases certain conditions were attached to the use of public funds by political parties. In American Party, the public funds were used only to help finance primary elections, and in Buckley, accepting public funds meant agreeing to expenditure ceilings and other restrictions. However, in view of the discussion in Buckley about the strong governmental interest in public financing of political parties, we find that the lack of any restrictions on political parties' use of public funds under Indiana law does not render the Indiana statutory scheme on its face violative of the plaintiffs' first amendment rights
 In addition, the plaintiffs argue that sections 7 and 8 are invalid because they provide public funding only to political parties and not to independent candidates. The Court in Buckley noted that "[s]erious questions might arise as to the constitutionality of excluding from free annual assistance candidates not affiliated with a 'political party' solely because they lack such affiliation." Buckley v. Valeo, 424 U.S. at 87 n. 118, 96 S.Ct. at 667 n. 118. The Buckley Court found that it had "no occasion to address that question in this case," id., pointing out that it was possible to construe Subtitle H as affording financial assistance to independent candidates, and that no independent candidate was challenging the law. The same is true of the case before us, and thus we also have no occasion to address the question.
 
 
 [5]
 The defendants argue that since a personalized license plate is a luxury item and not required for the lawful operation of a motor vehicle, the "unconstitutional conditions" cases are inapplicable. We recognize that motorists easily can do without personalized license plates, and that therefore any alleged coercion involved in the Indiana scheme necessarily would be slight. On the other hand, personalized license plates are public benefits, and we doubt seriously that Indiana could make them available to the public on a basis that offends the Constitution. See Elrod v. Burns, 427 U.S. at 358, 96 S.Ct. at 2682 ("[t]his Court's decisions have prohibited conditions on public benefits, in the form of jobs or otherwise, which dampen the exercise generally of First Amendment rights, however slight the inducement to the individual to forsake those rights"). Since we find that no first amendment rights are implicated by the Indiana scheme, we need not address the question of whether application of the "unconstitutional conditions" doctrine varies depending on the importance or value of the public benefit
 
 
 [6]
 This of course assumes that it wishes to do so. In their briefs and oral argument to this court, the plaintiffs have focused almost exclusively on their challenge to the Indiana law on its face. The Libertarian Party has not demonstrated any intention of developing a full factual record to support its claim of discrimination and there is some indication in the record that the parties intended the November 11 preliminary injunction hearing to function as a trial on the merits, at least with respect to the plaintiffs' claims for declaratory and injunctive relief. Nevertheless, because we are uncertain about the parties' intentions, we deem it inappropriate for us to dispose of the entire case on the merits